# E-filing

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name _Mason          Shavougue         A_
   (Last)              (First)           (Initial)

3

4  Prisoner Number _V80244_

5  Institutional Address _Kern Valley State Prison_

6  ═══════════════════════════════════════════════

7  **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

8  _Shavougue Antoine Mason_               **C**
   (Enter the full name of plaintiff in this action.)

9                                              **07  4594**
                vs.

10                                         Case No. _____ **SBA**
   _A. Hedgpeth, Warden_                   (To be provided by the clerk of court)

11  _____              **PETITION FOR A WRIT (PR)**
                                          **OF HABEAS CORPUS**
12  _____              _Evidentiary Hearing Requested_

13  _____

14  _____
   (Enter the full name of respondent(s) or jailor in this action)

15

16  ═══════════════════════════════════════════════
   Read Comments Carefully Before Filling In

17  When and Where to File

18       You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23       If you are challenging your conviction or sentence and you were not convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

1  <u>Who to Name as Respondent</u>

2       You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6       If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11       1.  What sentence are you challenging in this petition?

12            (a)    Name and location of court that imposed sentence (for example; Alameda

13                   County Superior Court, Oakland):

14  <u>Monterey County Superior Court     Salinos</u>

15            Court                              Location

16            (b)    Case number, if known  <u>MS 033582</u>

17            (c)    Date and terms of sentence <u>3/29/2005  /  c/5 years to Life</u>

18            (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19                   parole or probation, etc.)        Yes  <u>✓</u>   No _____

20            Where?

21            Name of Institution:  <u>Kern Valley State Prison</u>

22            Address: <u>P.O. Box 5101  Delano, CA. 93216</u>

23       2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  <u>3 counts of 2nd degree Murder arising out of 2 counts</u>

27  <u>of Gross Vehicular Manslaughter while Intoxicated</u>

28

3. Did you have any of the following?

       Arraignment:               Yes ✓     No _____

       Preliminary Hearing:      Yes ✓     No _____

       Motion to Suppress:      Yes ✓     No _____

4. How did you plead?

       Guilty _____    Not Guilty ✓    Nolo Contendere _____

       Any other plea (specify) _No_____

5. If you went to trial, what kind of trial did you have?

       Jury ✓    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?            Yes ✓     No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment            Yes ✓     No _____

    (b)    Preliminary hearing     Yes ✓     No _____

    (c)    Time of plea            Yes _____     No _____

    (d)    Trial                  Yes ✓     No _____

    (e)    Sentencing              Yes ✓     No _____

    (f)    Appeal                Yes ✓     No _____

    (g)    Other post-conviction proceeding     Yes _____     No _____

8. Did you appeal your conviction?         Yes ✓     No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal _Sixth District_ Yes ✓     No _____

        Year: _2006_    Result: _Judgement affirmed_____

        Supreme Court of California    Yes ✓     No _____

        Year: _2007_    Result: _Review Denied_____

        Any other court           Yes _____     No ✓

        Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1             petition?               Yes ✓    No____

2      (c)    Was there an opinion?        Yes ✓    No____

3      (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                    Yes ____    No ✓

5             If you did, give the name of the court and the result:

6             _____

7             _____

8  9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9  this conviction in any court, state or federal?        Yes ____    No ✓

10       [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11  challenged the same conviction you are challenging now and if that petition was denied or dismissed

12  with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13  for an order authorizing the district court to consider this petition.  You may not file a second or

14  subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15  U.S.C. §§ 2244(b).]

16      (a)    If you sought relief in any proceeding other than an appeal, answer the following

17               questions for each proceeding.  Attach extra paper if you need more space.

18      I.      Name of Court: _____

19             Type of Proceeding: _____

20             Grounds raised (Be brief but specific):

21             a._____

22             b._____

23             c._____

24             d._____

25             Result: _____Date of Result:_____

26      II.     Name of Court: _____

27             Type of Proceeding: _____

28             Grounds raised (Be brief but specific):

1           a._____

2           b._____

3           c._____

4           d._____

5           Result: _____ Date of Result:_____

6     III.   Name of Court: _____

7          Type of Proceeding: _____

8          Grounds raised (Be brief but specific):

9           a._____

10          b._____

11          c._____

12          d._____

13         Result: _____ Date of Result:_____

14    IV.   Name of Court: _____

15         Type of Proceeding: _____

16         Grounds raised (Be brief but specific):

17          a._____

18          b._____

19          c._____

20          d._____

21         Result: _____ Date of Result:_____

22   (b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                     Yes _____     No_____

24      Name and location of court: _____

25 **B. GROUNDS FOR RELIEF**

26      State briefly every reason that you believe you are being confined unlawfully. Give facts to

27 support each claim. For example, what legal right or privilege were you denied? What happened?

28 Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1    need more space.  Answer the same questions for each claim.

2         [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3    petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One: Violation of due process of law, Jury instructed with

6    an unconstitutional Mandatory presumption.

7    Supporting Facts: See page 11 thru 15 of Exhibit A (Petition for

8    Review to the California Supreme Court).

9    _____

10   _____

11   Claim Two: Due process rights Violated because there was

12   insufficient evidence to support the Murder Convictions.

13   Supporting Facts: See page 15 thru 24 of Exhibit A (Petition

14   for Review to the California Supreme Court).

15   _____

16   _____

17   Claim Three: Trial court admitted prejudial evidence of other bad

18   acts which were irrelevant to the issue of subjective Knowledge

19   Element of Implied Malice Murder.
     Supporting Facts: See page 24 thru 46 of Exhibit A (Petition

20   for Review to the ~~Cto~~ California Supreme Court).

21   US v Myers (7th Cic. 1990) 892 F. 2d 642, 648-649 (Claim four)

22   Ineffective assistance of Counsel (see Page 44-46 Exhibit A
     Strickland V. Washington (1984) 466 U.S. 668, 677

23   If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   _____

26   _____

27   _____

28   _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    _See table of authorities in Exhibit A, page iii thru vi,_

5    _of request for review in Supreme Court._

6    _____

7    Do you have an attorney for this petition?                Yes_____    No _✓_

8    If you do, give the name and address of your attorney:

9    _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on _8/08/ 07_                         _____

14                    Date                                  Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 7 -

**EXHIBIT A**

Petition for Review to California Supreme Court
and opinions of Sixth Appelate District.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................. iii

PETITION FOR REVIEW  ................................. 1

QUESTION PRESENTED .................................. 2

WHY REVIEW SHOULD BE GRANTED  ..................... 2

STATEMENT OF THE CASE  .............................. 3

STATEMENT OF FACTS ................................. 5

I.    PROSECUTION CASE ................................ 5

II.   ACCIDENT RECONSTRUCTION ...................... 7

III.  INTENT OR MENTAL STATE EVIDENCE .............. 7

IV.  DEFENSE CASE ...................................... 8

V.   REBUTTAL .......................................... 10

ARGUMENT ............................................ 11

I.    REVIEW SHOULD BE GRANTED TO DETERMINE
      THE CORRECT STANDARD OF PREJUDICE WHEN
      THE   TRIAL   COURT   INSTRUCTS   WITH   AN
      UNCONSTITUTIONAL MANDATORY PRESUMPTION
      .................................................... 11

II.   REVIEW SHOULD BE GRANTED TO DETERMINE
      WHETHER PETITIONER'S CONSTITUTIONAL DUE
      PROCESS RIGHTS WERE VIOLATED BECAUSE
      THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT
      THE MURDER CONVICTIONS. ...................... 15

III.   REVIEW SHOULD BE GRANTED TO DETERMINE
       WHETHER MASON'S TRIAL WAS FUNDAMENTALLY
       UNFAIR, IN VIOLATION OF HIS RIGHT TO DUE
       PROCESS, BECAUSE THE TRIAL COURT ADMITTED
       PREJUDICIAL EVIDENCE OF OTHER BAD ACTS
       WHICH WAS IRRELEVANT TO THE ISSUE OF THE
       REQUISITE SUBJECTIVE KNOWLEDGE ELEMENT
       OF IMPLIED MALICE MURDER . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF AUTHORITIES

## CASES

*Bruton v. United States* (1968)
    391 U.S. 123 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Carella v. California* (1989)
    491 U.S. 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

*Estelle v. McGuire* (1991)
    502 U.S. 62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Gray v. Linn* (5th Cir. 1993)
    6 F.3d 265 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*In re Winship* (1970)
    397 U.S. 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Jackson v. Virginia* (1979)
    443 U.S. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,24

*Kubat v. Thieret* (7th Cir. 1989)
    867 F.2d 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*McKinney v. Rees* (9th Cir. 1993)
    993 F.2d 1378 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40,41

*People v. Alcala* (1984)
    36 Cal.3d 604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*People v. Autry* (1995)
    37 Cal.App.4th 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*People v. Balcom* (1994)
    7 Cal.4th 414 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*People v. Bassett* (1968)
    69 Cal.2d 122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*People v. Bergschneider* (1989)
    211 Cal.App.3d 144 . . . . . . . . . . . . . . . . . . . . . . 26,37,38

*People v. Contreras* (1994)
      26 Cal.App.4th 944 . . . . . . . . . . . . . . . . . . . . . 18,20,22,23,37
                                                                      38

*People v. David* (1991)
      230 Cal.App.3d 1109 . . . . . . . . . . . . . . . . . . . . . . . . . 19,20

*People v. Ewoldt* (1994)
      7 Cal.4th 380 . . . . . . . . . . . . . . . . . . . . . . . . 26,27,32,35,37

*People v. Garceau* (1993)
      6 Cal.4th 140 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,36

*People v. Garcia* (1995)
      41 Cal.App.4th 1832 . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*People v. Gordon* (1990)
      50 Cal.3d 1223 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Holt* (1997)
      15 Cal.4th 619 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Laughlin* (2006)
      137 Cal.App.4th 1020 . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*People v. McCarnes* (1986)
      179 Cal.App.3d 525 . . . . . . . . . . . . . . . . . . . . . . . . 19,29

*People v. Miller* (1996)
      46 Cal.App.4th 412 . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*People v. Millwee* (1998)
      18 Cal.4th 96 . . . . . . . . . . . . . . . . . . . . . . . . . . 30,31,32

*People v. Ortiz* (2003)
      109 Cal.App.4th 104 . . . . . . . . . . . . . . . . . . . . . 27,29,39

*People v. Pinkston* (2003)
      112 Cal.App.4th 387 . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*People v. Roder* (1983)
      33 Cal.3d 491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*People v. Sully* (1991)
    53 Cal.3d 1195 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Talamantes* (1992)
    11 Cal.App.4th 968 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*People v. Thompson* (1980)
    27 Cal.3d 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38,39

*People v. Vanegas* (2004)
    115 Cal.App.4th 592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*People v. Watson* (1981)
    30 Cal.3d 290 . . . . . . . . . . . . . . . . . . . . . . . . 16,21,22,23

*People v. Zambrano* (2004)
    124 Cal.App.4th 228 . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Sandstrom v. Montana* (1979)
    442 U.S. 510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Sullivan v. Louisiana* (1993)
    508 U.S. 275 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Myers* (7th Cir. 1990)
    892 F.2d 642 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45,46

*Yates v. Evatt* (1991)
    500 U.S. 391 . . . . . . . . . . . . . . . . . . . . . . . . . 11,12,13,14

## CONSTITUTIONS

United States Constitution

    Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    Amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Due Process Clause . . . . . . . . . . . . . . . . . . . . . . . . 2,15,17,24-25
                                        40-42

# STATUTES

Evidence Code

    § 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25,26,35,45

    § 1101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,26,37

Penal Code

    § 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    § 191.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    § 192 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    § 12022.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4

Vehicle Code,

    § 20001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    § 23153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

California Rules of Court

    rule 8.500(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

# MISCELLANEOUS

CALJIC

    No. 2.50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39,44

    No. 8.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    No. 8.95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    No. 8.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,** | NO. |
| Plaintiff and Respondent, | SIXTH APPELLATE DISTRICT |
| v. | Appeal No. H028624 |
| **SHAVOUGUE ANTOINE MASON,** | |
| Defendant and Petitioner. | |

TO THE HONORABLE CHIEF JUSTICE RONALD M. GEORGE AND ASSOCIATE JUSTICES OF THE CALIFORNIA SUPREME COURT:

### *PETITION FOR REVIEW*

Petitioner, Shavougue Antoine Mason, hereby petitions this HONORABLE COURT for review of the unpublished opinion filed February 8, 2007 by the Court of Appeal, Sixth Appellate District.

## QUESTIONS PRESENTED

1.    Given the appellate court's finding the jury was instructed with an unconstitutional mandatory presumption, did it apply an incorrect standard in determining whether the constitutional error was prejudicial?

2.    Was there insufficient evidence to prove implied malice, an essential element of the murder convictions?

3.    Did the court violate appellant's due process rights when it admitted evidence of a prior incident involving alcohol and a death when appellant bore no fault in the accident and was not responsible for the death?

## WHY REVIEW SHOULD BE GRANTED

Review is appropriate in this case because the issues present important questions of law which have state-wide implications. (Cal. Rules of Court, rule 8.500(a).)    Whether an instruction violates the constitution because it involves a mandatory presumption is a recurring issue in criminal appeals. (See e.g. *People v. Roder* (1983) 33 Cal.3d 491, 505-506; *People v. Laughlin* (2006) 137 Cal.App.4th 1020; *People v. Vanegas* (2004) 115 Cal.App.4th 592; *People v. Pinkston* (2003) 112 Cal.App.4th 387.) There is a different standard of prejudice which applies when an instruction is an unconstitutional mandatory presumption.    Courts need guidance concerning the correct standard of prejudice in those cases.

The other issues presented also are important. One concerns what proof is necessary to prove implied malice in a drunk driving murder case. The second concerns the admission of a prior incident involving a gruesome death caused by another drunk driver, not appellant. The issue is whether the criminal conduct of another person is at all relevant when the issue is the defendant's own knowledge, and whether evidence of a horrific death caused by another person rendered appellant's trial fundamentally unfair.

## STATEMENT OF THE CASE

In an information filed April 20, 2004 by the Monterey County District Attorney's Office, appellant, Shavougue Antoine Mason, was charged with the murder of Rene Porras, Rosalinda Gonzales, and the couple's unborn child. (Pen. Code, §187 [counts 1-3].) Mason additionally was charged with vehicular manslaughter while intoxicated with gross negligence (Pen. Code, § 191.5, subd. (a) [counts 4-5]); four allegations of fleeing a crime scene (Veh. Code, § 20001, subd. (c)) vehicular manslaughter with gross negligence (Pen. Code, § 192, subd. (c)(1) [counts 6-7]); driving under the influence causing injury (Veh. Code, § 23153, subd. (a) [count 8]); and driving with .08% blood alcohol level, causing injury (Veh. Code, § 23153, subd. (b) [count 9]). The prosecutor's office also alleged four enhancements for infliction of great bodily injury (Pen. Code, § 12022.7, subd. (a)) and one

3

special allegation of great bodily injury upon a child under five (Pen. Code, § 12022.7, subd. (d)).  (CT 144-152.)

Jury trial began January 31, 2005 with in limine motions.  (CT 205.) On February 1 the trial court allowed the prosecutor to present evidence of Mason's prior traffic and accident history.  It also allowed the prosecution to introduce details of an accident not caused by Mason.  (CT 207-208.)  On February 7, 2005 the jury found Mason guilty of all charges and found true all but two alleged enhancements.  (CT 218-219, 221- 231.)

The trial court sentenced Mason on March 29.  (CT 263.)  As to the three murder counts, the court imposed an indeterminate sentence of 45 years to life (three consecutive sentences of 15 years to life).  Sentencing on all other counts was stayed pursuant to section 654.  The convictions for vehicular manslaughter with gross negligence, lesser included offenses of vehicular manslaughter while intoxicated with gross negligence, were set aside.  (CT 264; see also CT 258-259.)

On September 7, 2006 the court of appeal issued its opinion affirming Mason's convictions. On October 5, 2006 the court granted rehearing and issued a new opinion February 8, 2007 affirming Mason's convictions. A copy of that opinion is attached as Exhibit A.

4

## STATEMENT OF FACTS

### I.    PROSECUTION CASE

Rene Porras and Rosalinda Gonzales and their two young children, Rene Jr. and Joshua, were in their red BMW driving through a south Salinas residential area near Central Park. It was the noon hour of December 4, 2003. (RT 762, 947-948.) The BMW's speed entering the intersection of Park and Riker Streets was approximately 20 m.p.h. (RT 919, 920.) The speed limit was 25 m.p.h. (RT 763, 768; see Exhs. 30, 31.)

After their car entered the intersection, it was hit and badly damaged by a green Volkswagen Passat driven by Shavougue Mason. The BMW came to rest at the southeast corner of the intersection, against a house on Park Street. Porras and his pregnant wife died as a result of injuries from the collision. Porras had sustained major head injuries. Gonzales's neck was broken and her ruptured uterus hemorrhaged. At the time of the accident, Gonzales had been eight months pregnant. Her fully-developed fetus died as a result of Gonzales's injuries. Rene Porras Jr.'s tibia was fractured and required a cast. (RT 760-763, 804, 884, 899, 948, 1007-1009, 1253.)

Prior to the collision Mason had been driving his VW Passat down Park Street. Stop signs were posted along Park Street but Mason did not come to a stop at any of the posted stop signs located at three intersections along Park Street; Homestead Avenue, West Street, or at the site of the collision,

Riker Street. (RT 764, 766-768, 896, 897.) His estimated speed was 60 to 80 m.p.h. (RT 836-837, 876, 877, 878, 880, 895, 905.)

Mason stayed inside his car for 10 to 20 seconds. He then slowly emerged (RT 820, 830), looking both "very weary" and "very stunned." (RT 830, 831.) He walked to the BMW, leaned over, and briefly looked into the car through the passenger side window. (RT 819, 820, 822, 830, 831.) It was impossible for Mason to take either Porras or Gonzales from the car. (RT 804, 943.) Mason quickly left to go home and call police. He lived less than one-tenth of a mile from the accident scene. (RT 823, 839, 840, 844, 942; cf. 797.)

When Mason reached his Archer Street apartment, he immediately contacted 9-1-1 to report the accident. (RT 773, 775-777; 854, 856; Exhs. 34, 35.) Shortly thereafter police arrived at Mason's home and took him into custody. (RT 848, 849, 850, 852, 853, 859.) On the kitchen counter in Mason's apartment was a Bacardi Rum mixed drink, about 3/4 full. (RT 863, 865, 866.) In the VW's trunk compartment was an empty 750 mm. bottle of Hennessey cognac. (RT 769, 771, 1092-1093; Exhs. 2, 23, 24, 32.) Mason's cell phone was on the front floorboard area. (RT 801, 1094.)

When police officers took Mason into custody he smelled moderately of alcohol and had "somewhat glassy and red" eyes. (RT 1014.) After Mason was given field sobriety tests at 1:15 p.m. at the police department, the officer

concluded Mason was under the influence of alcohol. (RT 867, 1015-1016, 1017, 1019.) Mason's blood alcohol level at that time, measured with a hand-held breath test instrument, was .13. (RT 1027.) Based on a blood sample drawn at 1:50 p.m., Mason's blood-alcohol level was .19 percent.[1] (RT 870, 1012, 1033.) At noon on December 4 Mason's estimated blood alcohol level would have been between .22 to .23 percent. (RT 1034, 1044-1045.)

## II. ACCIDENT RECONSTRUCTION

Conclusions based on a reconstruction of the accident were: (1) Mason's VW had no mechanical problems which would have contributed to the accident; (2) the speed of the VW at impact was 46.28 m.p.h.; the BMW's speed was 20.16; and (3) at the site of the collision, Riker and Park Streets, the VW had not stopped at the stop sign. (RT 916, 919, 920, 924.)

## III. INTENT OR MENTAL STATE EVIDENCE

Mason had an eight-year "traffic criminal history." (RT 1063.) It included convictions for Vehicle Code violations committed in 1993 [alcohol-related reckless driving], 1995 [two speeding violations], 1996 [speeding, failure to obey a traffic sign], 1997 [two speeding violations], and 2001 [failure to yield to a pedestrian in a crosswalk, speeding].) (RT 1066-1069,

---

[1] The disparity between the result of the blood draw and that from the alcohol preliminary screening device is that the latter device does not necessarily accurately reflect alcohol that might be in a person's system. (RT 1042.)

7

1072, 1086-1090.) It also included an accident on October 6, 1999. Mason had hit another car when that car slowed down to turn. (RT 1073-1076.)

Mason also had been involved in an accident in the early morning hours of March 18, 2001 on Blanco Road in Monterey County ("the Blanco Road accident"). In that accident Mason had not been at fault. Both Mason's car and that of his good friend, Abad Hughes, were hit by a Jeep driving on the wrong side of the road. Hughes was killed. (RT 1079-1082.)

## IV. DEFENSE CASE

Mason was working as a night auditor/manager at the Monterey Beach Resort in December, 2003. He had been working overtime; eight-hour night and day shifts during that month. He was living with his girlfriend, Misty Flores, on Archer Street in Salinas. (RT 1255, 1256, 1506-1507, 1509.)

On December 4, 2003 Mason woke up early and helped a family friend by taking her child to school. Mason then went on to a friend's house, stayed there for some time, and eventually drove his friend to another location on Archer Street. (RT 1508-1509.) About 15 minutes before the noon hour Mason decided to return home to lay down, as he had slept but a few hours the night before and was tired. He drove down Archer and Villa Streets, turning right onto Park Street. (RT 1509, 1524.)

As he drove past Central Park, but before reaching Homestead Avenue, he was driving at approximately 25 m.p.h., but may have been driving

somewhat over the speed limit. (RT 1520, 1528.) As he passed Homestead

Avenue he dozed off. (RT 1510, 1522, 1524.) Mason woke up at the corner

of Park and Riker Streets, only to see the red BMW. (RT 1510, 1542, 1543.)

He immediately slammed on his brakes, but to no avail. (RT 1510, 1542.)

Mason's car crashed into the BMW's passenger door. (RT 1543.)

Mason's air bag deployed. After impact he sat in his car, stunned, and

then climbed out. He walked over to the other car. When he looked inside

he saw children crying but he could not get them out of the car. The driver

and front seat passenger were unconscious. Hysterical, unable to find his cell

phone and wanting to help, he ran home, only a block away, to call police.

(RT 1510-1511, 1517, 1544, 1546-1547, 1550, 1551.) He arrived at his

apartment and "flew in the door" of his apartment. (RT 1258, 1259.) He was

"hysterical." (*Ibid.*) He told Flores "he had been in an accident" and to call

9-1-1. (RT 1257.) Mason told the dispatcher that help was needed. (RT

1259, 1511.)

Mason had not had any alcohol to drink before the accident occurred.

(RT 1511.) However, once home he retrieved a pint bottle of Hennessey

cognac from the cabinet and drank about half of it. (RT 1512-1513, 1550,

1558; see Exh. A.) Mason also took some sips from a Bacardi Silver as well.

(RT 1513-1514.)

As he was talking with the 9-1-1 dispatcher, someone knocked at the door. (RT 1515.) Police were waiting for him downstairs. Mason left the apartment to meet with them. (RT 1515-1516.) He was immediately handcuffed. A little while after being outside, Mason began to feel the effects of the alcohol he had been drinking at home. (RT 1518.)

When cross-examined by the prosecutor about the Blanco Road accident, Mason said neither he nor his good friend and roommate, Hughes, had been drinking that evening. They left a friend's home around 3 a.m. (RT (RT 1560- 1562, 1573.) After the crash he climbed out of his car and saw Hughes's car in ditch and his body hanging out of the window. He knew Hughes was dead and he could not do anything for him. He stayed at the scene for about 20 minutes. (RT 1565, 1566.) A friend drove by, stopped, and took Mason home to call police. (RT 1567, 1569.) Prior to that he had not seen any motorists who had stopped at the scene. (RT 1570.)

When he arrived back at his and Hughes's home, he told Hughes's fiancé about his fate. She became hysterical. Mason drank some banana rum. (RT 1572-1573, 1575, 1576.) He called 911 and they all returned to the scene.

## V.   REBUTTAL

Officer John Lynn talked with Misty Flores on December 9, 2003. Flores told him Mason drank a 12-ounce bottle of Bacardi Silver plus a few

sips from a second bottle. She said there had been no bottles of Hennessey in the apartment. The first Bacardi bottle went into the dumpster and the second one was taken by police. (RT 1348-1350.)

Erin Christine Finley was on Highway 1 about 3 a.m. on March 18, 2001 near Sand City. She was driving north, behind a blue Jeep before it drove out of sight. (RT 1578.) About ten minutes later, on Blanco Road, she again saw the Jeep. It had been involved in an accident and was in the middle of the lane. (RT 1579.) There was another car at the scene. Its occupants, two teenagers about 16 and 17, had just gotten out of the car. Finley saw they had a cell phone and told them to call 911. (RT 1579-1580.) No one else was there. (RT 1580.) A few yards away another car was in a ditch. Its driver, a man, was dead. (RT 1581, 1582.)

## ARGUMENT

### I.

### REVIEW SHOULD BE GRANTED TO DETERMINE THE CORRECT STANDARD OF PREJUDICE WHEN THE TRIAL COURT INSTRUCTS WITH AN UNCONSTITUTIONAL MANDATORY PRESUMPTION

In its initial opinion, the court of appeal concluded that CALJIC No. 8.95 created an unconstitutional conclusive presumption that any violation of California's basic speed law constituted an act inherently dangerous to human life. However, the court of appeal decided the constitutional error was harmless because "[t]he evidence of defendant's culpability is overwhelming."

11

(September 7, 2006 opinion, p. 25.) Appellant filed for rehearing, pointing out the court of appeal had failed to apply the prejudice analysis required by *Yates v. Evatt* (1991) 500 U.S. 391 when the jury is instructed with an unconstitutional mandatory presumption.    The court of appeal granted rehearing and issued a new opinion February 8, 2007. (See Exhibit A.) While the new opinion mentions *Yates v. Evatt*, the appellate court did not apply the prejudice analysis required by that case. (See opinion, pp. 22-25.) Review should be granted to clarify how prejudice must be evaluated when the jury is instructed with an unconstitutional mandatory presumption.

When the jury is provided an erroneous presumption, the reviewing court cannot decide the error is harmless by relying on the overwhelming evidence of guilt.  Rather, when an erroneous presumption hinders the jury's role as a factfinder, the error cannot be considered harmless unless the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, "are so closely related to the ultimate facts to be presumed no rational jury could find those facts without also finding that ultimate fact, making those findings functionally equivalent to finding the element required to be presumed." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 281, citation omitted.)

In *Yates v. Evatt* the United States Supreme Court discussed at length the proper standard of prejudice when the jury is improperly instructed with an erroneous presumption:

> To satisfy *Chapman's* reasonable doubt standard, it will not be enough that the jury considered evidence from which it could have come to the verdict without reliance on the presumption. Rather, the issue under *Chapman* is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption. Since that enquiry cannot be a subjective one into the jurors' minds, a court must approach it by asking whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption." (*Yates v. Evatt, supra*, 500 U.S. at 404-405.)

Thus, the first question is "whether the jury's verdict ... rest[ed] on that evidence as well as on the presumption[] ...." (*Id.* at 407.) The second question is "whether that evidence was of such compelling force as to show beyond a reasonable doubt that the presumption[] must have made no difference in reaching the verdict obtained." In other words, whether the evidence of the presumed fact made the presumption superfluous. (*Ibid.*)

An even more "restrictive" analysis is necessary when an instruction creates an erroneous presumption of an element of a crime. (*Id.* at 406, fn. 10 [111 S.Ct. at p. 1894].) Review of this sort, which is expressly derived from

13

Justice Scalia's concurring opinion in *Carella v. California* (1989) 491 U.S. 263, "would focus only on the predicate facts to be relied on under the presumption and would require a court to determine whether they 'are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact.' " (*Ibid.*, quoting *Carella v. California, supra,* 491 U.S. at p. 271 (conc. opn. of Scalia, J.).) This "narrow focus" is appropriate "because the terms of an erroneous presumption tend to deter a jury from considering any evidence for the presumed fact beyond the predicate evidence; indeed, to do so would be a waste of the jury's time and contrary to its instructions." (*Yates v. Evatt, supra,* 500 U.S. at p. 406, fn. 10 [111 S.Ct. at p. 1894].)

The court of appeal did not correctly apply this test for prejudice. It failed to address the first question, which is what evidence the jury reasonably would have considered in light of the presumption. That is, "whether the jury's verdict ... rest[ed] on that evidence as well as on the presumption[] ...." (*Id.* at 407.) Instead, the court of appeal leapfrogged to the second question, which is "whether [the] evidence was of such compelling force as to show beyond a reasonable doubt that the presumption[] must have made no difference in reaching the verdict obtained." (*Ibid.*) Thus, the court concluded all the evidence of malice was so strong, "[t]here is no realistic chance the defendant was actually harmed by the error." (February 8, 2007 opinion, p. 25.)

Had the appellate court addressed the preliminary question, it would have been compelled to reach a different conclusion as to prejudice. In this case the only fact the jury had to consider in deciding whether there was implied malice was Mason's act of speeding. The erroneous presumption made it unnecessary for the jury to consider running stop signs, Mason's driving history or his level of intoxication. Thus, the appellate court's reliance on the strength of the prosecution evidence (see opinion, pp. 24-25) was incorrect under *Yates v. Evatt* since the court failed to address the preliminary question. Since the jury was told speeding proves implied malice by itself, it is unreasonable to conclude the jury would have necessarily considered the other evidence presented by the prosecutor. Review should be granted to clarify the appropriate test for prejudice in cases involving a mandatory conclusive presumption.

## II.

### REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER PETITIONER'S CONSTITUTIONAL DUE PROCESS RIGHTS WERE VIOLATED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE MURDER CONVICTIONS

"[A]n essential of the due process guaranteed by the Fourteenth Amendment [is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof--defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every

element of the offense." (*Jackson v. Virginia* (1979) 443 U.S. 307, 316 [61 L.Ed.2d 560, 571, 99 S.Ct. 2781, 2787], citing to *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; accord, *Sandstrom v. Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 48, 99 S.Ct. 2450, 2457].)   Review should be granted to determine whether there was sufficient evidence to sustain Mason's murder convictions.

The evidence showed that prior to the fatal collision, Mason had been driving his car down Park Street.  He had been driving over the speed limit and he did not stop at any of the posted stop signs located at three of the intersections along Park Street, including the site of the collision, Riker Street. (RT 764, 766-768, 836-837, 876, 877, 878, 880, 895, 896, 897, 905.) However, it was undisputed that until the time Mason's car hit the BMW, his was the lone moving car on Park Street. (RT 891.)  There was no evidence Mason's car had swerved, passed any other car, or engaged in erratic driving. In fact, cars were present on Park Street; all were parked. (RT 890.)  As the prosecutor noted, Mason had driven down Park Street "*in a very straight line without veering off one way or another* into any cars that [were] parked on the sides of the residential roads[.]"  (RT 1608, italics added.)

The prosecutor's theory was murder based on implied malice.  "Implied malice requires proof the accused acted deliberately with conscious disregard for life." (*People v. Watson* (1981) 30 Cal.3d 290, 296 ("*Watson*").)  In other

words, the jury must find "the defendant actually appreciated the risk involved, i.e., a subjective standard. [Citation.]" (*Id.* at pp. 296-297.) Attempting to prove this required knowledge element, the prosecution presented evidence that between 1993 and 2001 Mason had been convicted of a variety of Vehicle Code violations, notably, one conviction for failure to yield to a pedestrian in a crosswalk, six speeding convictions, and one conviction for failure to obey a traffic sign. (RT 1063, 1066-1069, 1072, 1086-1090.) Mason also had suffered a 1993 conviction for alcohol-related reckless driving. (RT 1069, 1084, 1090.) However, the conviction was not based on any evidence of dangerous driving. Rather, a police officer saw Mason's car "stopped at a green light through two cycles[.]" (RT 1086.)

Mason also had been involved in a pre-dawn accident on March 18, 2001 (the "Blanco Road accident") which involved a traffic fatality. Mason was driving ahead of his friend, Abad Hughes, who was following him. A Jeep, driving on the wrong side of the road, hit Mason's car and sent it off the road. The Jeep continued in the wrong lane of traffic and crashed into Hughes's car, killing him. Mason had not been at fault in that accident, was not arrested for being under the influence of alcohol at the time of the collision, nor was there any allegation he had been speeding when the accident occurred. (RT 1077-1082.)

The prosecution presented all this evidence to establish the implied malice element necessary for a murder conviction in this case. Review should be granted to determine whether this evidence was insufficient to establish that requisite element, violating Mason's due process rights.

*People v. Contreras* (1994) 26 Cal.App.4th 944, 948 ("*Contreras*") illustrates why the prosecution's evidence cannot support the implied malice finding needed for a murder conviction in this case. In *Contreras* the prosecution established not only that Contreras had been cited for numerous violations of the Vehicle Code, it also established what conduct constituted those violations. (See, e.g., *id.* at pp. 949-950 [58 mph in 35 mph zone; 85-90 mph on the freeway and driving recklessly; speeding, unsafe lane changes and tailgating in a residential area; almost causing "several traffic accidents," almost causing accident and reckless driving arrest while driving 90-100 miles per hour and weaving through traffic, and police officer's admonishment that Contreras's reckless driving could lead to a traffic fatality].) The evidence also established Contreras had been racing with other tow trucks when the deadly accident occurred. On this evidence the appellate court concluded, "Based on his driving record, his prior accident, and the known inadequacy of his brakes on the date in question, the issue was not whether Contreras would have a serious traffic accident, but when." (*Id.* at p. 956.) Thus the appellate court had no difficulty finding the evidence sufficient to show

18

Contreras "subjectively knew his driving created a substantial risk to human life and consciously disregarded that danger." (*Id.* at p. 957, citations omitted.)

Similarly, other cases examining the evidence necessary to establish the implied malice element of second degree murder also demonstrate the insufficiency of evidence in this case. (See, e.g., *People v. Autry* (1995) 37 Cal.App.4th 351, *People v. Talamantes* (1992) 11 Cal.App.4th 968, *People v. David* (1991) 230 Cal.App.3d 1109; *People v. McCarnes* (1986) 179 Cal.App.3d 525.) In *McCarnes* substantial evidence of malice existed when the defendant had a .27 blood alcohol level, had been driving recklessly, had been convicted four separate times for driving under the influence, and had had "repeated exposure to a drinking driver's education program." (*McCarnes, supra,* at p. 532, 534.) In *People v. Autry* substantial evidence of malice consisted of the defendant's four prior drunk driving convictions, a .22 blood alcohol level, formal education of the dangers of driving while intoxicated, admonishments from his probation officer the morning of the accident not to drink and drive, and--during the accident at issue--appeals from his passengers to stop driving lest they be killed, his inability to keep his car in control, and three near-collisions with other cars. (*Autry, supra,* at pp. 358-359.)

Similarly, in *People v. Talamantes* the evidence consisted of the defendant's .32 blood alcohol level, three empty beer cans on the front floorboard, formal education showing injuries and death caused by drunk drivers, and speeding in the predawn hours without headlights. (*Talamantes, supra*, at p. 971.) And finally, in *People v. David* evidence of implied malice included two prior convictions for driving under the influence of drugs, both resulting in accidents, formal education of the dangers of drinking and driving, and the defendant's driving maneuvers preceding the accident (speeding, running a red light and almost hitting pedestrians, swerving and passing slower traffic, forcing oncoming traffic to move into another lane). (*David, supra*, at p. 1115.)

In striking contrast, the implied malice showing in this case consisted of evidence that Mason was driving over the legal limit through a residential area and did not stop at three posted stop signs. There was no evidence of any erratic or evasive driving on his part, no near misses with other cars or pedestrians in the street. Although witnesses estimated his speed as high as 80 miles per hour, his speed at impact was 46.2 m.p.h., allowing a reasonable inference that as Mason neared the intersection of Park and Riker Streets he had already reduced his speed, further reducing it when he braked as he became aware of the BMW in the intersection, or that he had not been traveling as fast as witnesses had speculated. (See, e.g., RT 877, 905.)

Further, Mason's convictions related to speeding, failure to yield to a pedestrian in a crosswalk, and failure to obey a traffic sign only demonstrated Mason had committed these Vehicle Code violations. It did not establish, as in *Contreras,* Mason's speed leading to the citation, whether he had caused any accidents with other people or property, or even if he had nearly missed hitting people or property. While his conviction for alcohol-related reckless driving stemmed from his conduct while driving, that conduct did not consist of speeding, driving erratically, or almost causing an accident.

Although Mason had been involved in two accidents, he had not been at fault in the accident that claimed his friend's life. The other accident involved a non-fatality accident and again, Mason had not been cited for speeding or reckless driving as a cause of the accident, nor of drinking and driving. Finally, there was no evidence Mason attended any driver education program demonstrating the dangers inherent when drinking and driving.

The seminal case in this area is *People v. Watson, supra.* In *Watson* this Court found there was sufficient evidence to demonstrate probable cause to charge second degree murder. (*Id.* at p. 300.) The evidence adduced in *Watson* demonstrated the defendant drove to a bar, drank enough alcohol to raise his blood alcohol level over the legal limit, "drove at highly excessive speeds through city streets ... nearly collid[ing] with another car after failing to stop for a red light," and resumed speeding before the fatal accident

21

occurred.  (*Id.* at p. 301.)  However, while these facts supported *probable cause* to bind the defendant over for trial, the Supreme Court took pains to say

> We do not suggest that the foregoing facts conclusively demonstrate implied malice, or that the evidence necessarily is sufficient to convict defendant of second degree murder. *On the contrary, it may be difficult for the prosecution to carry its burden of establishing implied malice to the moral certainty necessary for a conviction.*
> (*Ibid.*, italics added.)

*Watson* controls here.  On the evidence adduced at Mason's trial, the prosecution did not carry its burden of establishing implied malice to the moral certainty necessary for a conviction.  Although Mason had caused one accident in the past, he did not do so because he was driving under the influence.  The arrest he suffered for driving under the influence was not accompanied by erratic driving, speeding, almost causing an accident, or almost hitting a person or property.  Rather, the police noted he failed to move his car through two green lights.  Although Mason had accrued six speeding violations, there was no evidence of his speed or whether his speeding caused any type of accident or near-accident, as was seen in *Contreras*.  The evidence as to the Blanco Road accident did not demonstrate Mason caused the accident by his conduct or because he was under the influence of alcohol.[2]

---

[2]Although a witness testified in rebuttal that the Jeep's driver had been intoxicated, there was no evidence Mason knew this.  (See RT 1581, 1582.)

22

The prosecutor contended implied malice was shown by Mason's "numerous contacts with law enforcement and the criminal justice system regarding traffic violations." (RT 1605.) However, the prosecution evidence fell far short of proving Mason "subjectively knew his driving created a substantial risk to human life and consciously disregarded that danger." (*Contreras,* at p. 957.) Instead, the evidence showed Mason had been convicted of Vehicle Code violations, but his conduct during those violations did not "ultimately endanger[] other community members...." (*Ibid.*)

The same is true of the other evidence. While Mason was involved in a traffic accident, no evidence demonstrated the accident was caused by Mason's speeding, reckless driving, or driving while under the influence. The reckless driving conviction stemmed from conduct that could not have been further detached from speeding. And as to the Blanco Road accident, there were only the prosecutor's implied accusations (see, e.g., RT 1590, 1605), but no proof that Mason's drinking or his driving was the cause. The undisputed evidence at trial was that the driver of the Jeep caused the accident. In sum, the prosecution evidence could not meet the prosecution's burden of proof on the implied malice element. That is, it failed to establish Mason possessed, from his prior driving experiences, the requisite subjective knowledge "to the moral certainty necessary for a conviction." (*Watson, supra,* at p. 301.)

Instead, this case presents what *Watson* called "the routine charging of second degree murder in vehicular homicide cases." (*Ibid.*) While the events here were tragic, Mason's guilt of vehicular manslaughter while intoxicated with gross negligence does not correspondingly translate into guilt of second degree murder. The evidence before the trial court did not meet the standard of "'substantial' proof of the essentials which the law requires in a particular case." (*People v. Bassett* (1968) 69 Cal.2d 122, 138-139.) As the prosecution failed to meet its burden of proof on the implied malice element of murder, the evidence was insufficient to support the murder convictions. Review should be granted to determine whether Mason's murder convictions must be reversed due to insufficient evidence. (*Jackson v. Virginia, supra,* 443 U.S. at p. 316.)

## III.

**REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER MASON'S TRIAL WAS FUNDAMENTALLY UNFAIR, IN VIOLATION OF HIS RIGHT TO DUE PROCESS, BECAUSE THE TRIAL COURT ADMITTED PREJUDICIAL EVIDENCE OF OTHER BAD ACTS WHICH WAS IRRELEVANT TO THE ISSUE OF THE REQUISITE SUBJECTIVE KNOWLEDGE ELEMENT OF IMPLIED MALICE MURDER**

Over appellant's objections (RT 754-756, 757; see CT 182-201), the trial court admitted a variety of incidents to prove the element of implied malice in the murder counts. (RT 755.) It ruled the prior incidents showed Mason's knowledge of the "danger of unsafe driving and the consequences to human life" (RT 755; see CT 177-179) and thus were admissible under

Evidence Code sections 1101 ("section 1101"), subdivision (b), or Evidence Code section 352 ("section 352"). One of the incidents involved an accident in 2001 where Mason had been driving in Monterey County on Blanco Road, followed by his friend, Abad Hughes, in another car. A Jeep driven by another person crossed into oncoming traffic, hitting both cars and killing Hughes. (RT 1078-1082.) Despite the fact Mason was not at fault in that accident, and despite the fact the trial court did not admit evidence of another accident occurring in 1997 because the extent to which Mason was at fault was unclear (RT 755), it nevertheless found the Blanco Road accident demonstrated Mason had experienced a "first hand lesson in the danger of unsafe driving and the consequences to human life." (*Ibid.*)

Review should be granted to determine whether it was error to admit this evidence. Review is important to determine whether the introduction of evidence of appellant's prior bad acts was inadmissable under Evidence Code section 1101, subdivision (b). Further, review is important to determine whether the error rendered Mason's trial fundamentally unfair, violating his right to due process of law under the United States and California Constitutions.

A basic principle under California law is that evidence of uncharged crimes is inherently prejudicial because it tempts "the tribunal . . . to give excessive weight to the vicious record of crime thus exhibited, and either to

allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge." (*People v. Alcala* (1984) 36 Cal.3d 604, 631, citation omitted.)

Due to the inherent risk of prejudice, evidence of uncharged crimes is admissible only when "relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) The evidence must tend directly to establish the crime charged by proving a material fact, such as tending to establish the identity, motive, intent, knowledge, design or plan of the perpetrator. (*People v. Bergschneider* (1989) 211 Cal.App.3d 144, 160; see § 1101, subd. (b).)

Before evidence of uncharged crimes may be admitted under section 1101, it must meet three criteria:

> (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence, e.g., Evidence Code section 352. [Citations.] (*People v. Sully* (1991) 53 Cal.3d 1195, 1224, emphasis in original.)

Even if relevant to prove a material fact, evidence of uncharged crimes should be excluded if it is merely cumulative of other evidence or more prejudicial than probative. (*People v. Ewoldt, supra,* 7 Cal.4th at pp. 404, 406; *People v. Holt* (1997) 15 Cal.4th 619, 631-632.) The bar on uncharged misconduct in section 352 "applies to evidence which uniquely tends to evoke

an emotional bias against ... [one party] as an individual and which has very little effect on the issues." (*People v. Garceau* (1993) 6 Cal.4th 140, 178, internal quotation marks omitted.)

As with all evidentiary rulings, the trial court's decision to admit evidence of uncharged crimes is reviewed for abuse of discretion. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1239.) However, the trial court's discretion is narrow when the evidence involves uncharged crimes introduced under section 1101. Such evidence is "'so prejudicial that its admission requires extremely careful analysis.'" (*People v. Ewoldt, supra,* 7 Cal.4th at p. 404, citation omitted.) "'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial probative value.*'" (*Ibid.,* citation omitted, emphasis and bracketed material in original.)

The prosecution's task in this implied malice murder prosecution was to demonstrate Mason acted deliberately and with conscious disregard for life. Thus it had to establish Mason's "subjective awareness," that is, his "knowledge—gained in the course of the prior misconduct—of the natural consequences, dangerous to life, of the reckless operation of a motor vehicle, and of his persistence in that behavior, thus evidencing a conscious disregard for the lives of others on the road." (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 111-112, italics added; see CT 305 [CALJIC 8.11].)

The evidence the prosecution introduced about the Blanco Road accident came from the California Highway Patrol officer who investigated it. The officer arrived on scene in the early morning hours of March 18, 2001. He saw a heavily damaged blue Jeep, driven by Shane Long, blocking Blanco Road. The officer also saw a red car, heavily damaged as well, containing the remains of the driver, Abad Hughes, who was killed in the accident. Yet another car, also involved in the accident, was further along, in a ditch off the shoulder of Blanco Road. That car was a gray Dodge Stratus, driven by Shavougue Mason. (RT 1077-1080.)

As noted *ante*, the trial court ruled the challenged evidence admissible because it showed Mason's "first hand lesson in the danger of unsafe driving and the consequences to human life." (RT 755.) However, the evidence was irrelevant to a showing of Mason's subjective awareness because, as the trial court acknowledged, Mason did not cause the accident. (RT 757.) There is no lesson to be learned "first hand" when one's own conduct does not cause the accident. For example, in *People v. Garcia* (1995) 41 Cal.App.4th 1832, 1850, the reviewing court found the defendant learned *"firsthand"* about the dangers of driving under the influence when "he was unable to keep his vehicle in his own lane and, on another occasion, he not only crossed over the center line but continued to drive in the wrong lane for some distance thereby forcing a number of vehicles, including one patrol car, to leave the roadway

28

to avoid a head-on collision with him." (Italics added.) Here the Blanco Road

evidence could not meet the standard required for admission of prior bad acts

because Mason's driving did not cause the accident.

On Blanco Road, the Jeep's driver caused the accident, crossing over

the center dividing line and driving on the wrong side of the road into

oncoming traffic. (RT 1081.) In this case, the evidence was that Mason had

been driving straight and never crossed over the dividing line into oncoming

traffic on December 3, 2003. In the accident Mason caused, he did not drive

like the Jeep's driver had. Therefore the Blanco Road accident was irrelevant;

it did not advise Mason about the danger to others because he did not drive

like the Jeep's driver.

The Blanco Road accident did not show, as it should have, Mason's

prior misconduct and his persistence in that behavior. (*People v. Ortiz, supra,*

109 Cal.App.4th at p. 111.) A "knowledge per se" standard based on the

driving of others erodes the subjective standard necessary to a finding of

implied malice. It eliminates the vital factor of the accused's own reckless

behavior *and* his "persistence" in *continuing* that behavior. (*Ibid.*) Since the

Blanco Road evidence did not show *Mason's* driving "sensitize[d]" him "to the

dangerousness of such life-threatening conduct," the evidence should have

been excluded. (*Id.* at pp. 112-113; see, e.g., *McCarnes, supra,* 179

Cal.App.3d at p. 535 [appreciation of risk shown through accused's

29

"portentous pattern of reckless, high-speed passing maneuvers on two-lane roads, involving repeated and deliberate driving into oncoming traffic"].) As this evidence was irrelevant to the issues at hand, the trial court erred when it ruled it admissible.

The trial court also ruled, "Should Mr. Mason testify and testify regarding the post-accident drinking on the night in question, December 2003, then the Court would admit evidence of the earlier statements [of Mr. Mason] from March 18th, 2001." (RT 756.) It ruled the evidence was relevant to credibility, relying on *People v. Millwee* (1998) 18 Cal.4th 96. It also ruled the evidence's value was more probative than prejudicial and that the evidence "should not create any prejudice as to Mr. Mason. He was a witness ... not someone liable in that accident." (RT 757.) It also held the evidence would not create an undue consumption of time or confuse the issues. (*Ibid.*) Review should be granted because the court erred in its analysis.

In *People v. Millwee, supra,* the defendant was accused of shooting his mother. Millwee contended the shooting had been an accident; he had been holding the gun's trigger, it misfired when his leg suddenly jerked. To cast doubt on Millwee's version of events, the prosecutor asked Millwee whether he had had another "accident" with the *same gun, two days after* his mother's shooting, where he had shot a man in San Diego. Millwee refused to answer, asserting the charges had not yet been resolved.

The prosecution wanted to impeach Millwee in rebuttal with excerpts from Millwee's testimony in the San Diego case. It contended Millwee had offered a similar excuse for shooting the man in San Diego as he had for shooting his mother. The trial court ruled the evidence was admissible impeachment because "it suggested that defendant offered the same 'pat' or false excuse for both shootings." (*Id.* at p. 130.)

The prosecution produced Millwee's testimony under oath about his explanation for accidentally shooting a man in San Diego. Millwee contended he had been holding the same gun he used to shoot his mother only two days earlier by the trigger. He was suddenly distracted and the gun fired, unintentionally. The evidence was brief and limited to Millwee's testimony about the shooting. There also was evidence the victim had recovered. "No other evidence from the San Diego trial was introduced. The jury never learned that defendant was convicted of attempted voluntary manslaughter in that case[.]" (*Id.* at p. 130.) Further, the trial court gave the jury a limiting instruction regarding its use of this evidence, advising it could not use this evidence "for any purpose other than to assess his credibility as a witness in this case[.]" (*Ibid.*)

When the trial court in this case allowed the prosecution to question Mason about his post-accident drinking after the Blanco Road accident for purposes of assessing his credibility, it erred. The prosecution's reason for

31

introducing this evidence was to show Mason had a propensity for drinking and driving. Although the trial court ruled the evidence was relevant to credibility, even if it was admissible under section 1101, subdivision (c), any probative value was far outweighed by its potential for unfair prejudice. (*People v. Balcom* (1994) 7 Cal.4th 414, 422; *People v. Ewoldt, supra,* 7 Cal.4th at p. 405-406.)

The trial court's reliance on *People v. Millwee* was misplaced. In contrast with the facts present in *Millwee*, where he had been charged with responsibility for both shootings, Mason had never been charged with the 2001 accident. Millwee also had refused to answer the prosecutor's question about his excuse for the San Diego shooting, although he had previously testified under oath about the "accidental" nature of that shooting. Additionally, the evidence on this issue had been brief and contained no evidence of Millwee's conviction in that case. In this case, in contrast, Mason had never been charged with the 2001 accident and there was no reason to impeach Mason because he had admitted to drinking after the Blanco Road accident. (RT 1559.)

Moreover, in contrast to *Millwee*, the evidence on this issue was *not* brief, did involve an undue consumption of time, and confused the issues. The prosecutor questioned Mason extensively about events occurring before the Blanco Road accident, to show Mason, as well as his friend, had had the

opportunity to drink before the accident.   (See RT 1559-1562.)  Then the

prosecutor questioned Mason about what happened shortly before the accident

occurred and after the police questioned him.

Q:    "You go back to Abad's car, don't you?

A:    Yes.

Q:    What do you see when you get back there?

A:    He was hanging out of the window.

Q:    Was he dead or alive?

A:    He looked like he was deceased.

Q:    Okay.  Did you try to help in any way as far as Mr. Hughes?

A:    There was nothing I could do.  It was a scene that basically I couldn't do anything.  As far as I knew, I couldn't do anything.

Q:    You couldn't do anything?

A:    Yeah.

Q:    So you didn't even approach him, right?

A:    I was just standing there on the road.

Q:    You didn't even approach him, right?

A:    No.

Q:    You didn't touch him, right?

A:    No.
....

Q:    ...You stand up and you haven't even gone down to look at Mr. Hughes, right?

33

A:    No.

....

Q:    During this time had you even gone to see what became of the driver of the blue Jeep?

A:    It was the same thing. I just looked. I thought he was probably not conscious or something. He was still intact in the Jeep.

Q;    I'm sorry, you thought he was unconscious?

A:    I thought he might be unconscious, but I really was just kind of in a state of, I don't know, blank. My mind was, like, blank. It was an accident. (RT 1566-1568.)

The prosecutor then elicited that during the twenty-minute period Mason was on scene, no other car had passed by and no other people had been there. (RT 1568-1570.) The prosecutor's next line of attack was to show Mason had the opportunity to call police from a variety of locations other than his house, including the police department. (RT 1571-1572.)

The prosecutor's cross-examination continued:

Q:    "[And the investigating officer] asked you about whether you had been drinking, right?

A:    Yes.

Q:    After this terrible, terrible accident?

A:    Yes.

Q:    And that was just a couple of sips that time?

A:    Yes. Probably, just, it was a fifth bottle, so I'm just saying a couple sips. I don't recall exactly how much I drunk out of it.

Q:    Back there on the road, Blanco Road, Mr. Mason, you told Joshua Miller to get you out of there because you had been drinking and driving; isn't that right?

A:    No, I did not tell him that.

Q:    You wanted to get out of there because you had been drinking and driving; isn't that right?

A     No, that is not correct." (RT 1575-1576.)

As this questioning demonstrates, under the "'extremely careful analysis'" required by section 1101 (*People v. Ewoldt, supra,* 7 Cal.4th at p. 404, citation omitted), the trial court should have ruled evidence of the Blanco Road accident was more prejudicial than probative because its "probative value is substantially outweighed by the probability that its admission will ... create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) In this case the Blanco Road evidence created undue prejudice, confused the issues, and misled the jury. The jury heard details about the Blanco Road accident that were irrelevant to Mason's admission he had had something to drink after that accident. The prosecution's evidence had no effect on the disputed issues. It showed others at the scene, in contrast with Mason, had tried to help both men. (RT 1582, 1583.) It showed Hughes's body had been "hanging out of the driver's side from his waist where the window starts and then his head was smashed into the ground" and that his "brain matter [was splattered] across the road" while Mason either stood virtually motionless or heartlessly left the scene. (RT

35

1582.) This was highly prejudicial, emotionally charged evidence which had no bearing on the issues at Mason's trial.

There also was no relevance to the issues in dispute of evidence which showed Mason had had the opportunity to drink. After all, he already had admitted his conduct of leaving "vehicular fatality accidents" to go home and then drink alcohol. (RT 1559.) There was no relevance to the issues in dispute that Mason did not attempt to help his good friend, even though he unmistakably was dead, or the Jeep's driver, who was trapped in his car. (See RT 1566-1568.) Presentation of this evidence was an undue consumption of time.

The only reason the prosecution presented this evidence was to unfairly malign Mason in the eyes of the jury. Mason's denials could not erase the implications, clearly voiced in the prosecutor's summation, that Mason was nothing better than a liar, a man who drinks and drives, causes accidents and death, and thinks only of how he can evade responsibility for his actions. (See, e.g., RT 1590, 1637.) In other words, a person of bad character and propensity to commit these type crimes.

By its terms, section 352 "applies to evidence which uniquely tends to evoke an emotional bias against ... [one party] as an individual and which has very little effect on the issues." (*People v. Garceau* (1993) 6 Cal.4th 140, 178, internal quotation marks omitted.) As the jury's emotional bias against Mason

undoubtedly was evoked by the Blanco Road evidence, its introduction in this trial was error.

In contrast to the introduction of the Blanco Road accident, the trial court did admonish the jury about the limited purpose of the evidence of Mason's traffic history, advising them the evidence was introduced solely to help them determine "the existence or the intent or mental state which is a necessary element of the crime of murder as charged in counts 1,2,3." (RT 1061.) However, it nevertheless was error for the trial court to admit Mason's prior traffic and accident history under section 1101.

Section 1101 allows evidence of uncharged crimes *only* when "relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt, supra,* 7 Cal.4th at p. 404.) This is so because of the inherent risks of prejudice. Thus the evidence must tend directly to establish the crime charged by proving a material fact. (*People v. Bergschneider, supra,* 211 Cal.App.3d at p. 160.) Cases reviewed in the section of this petition addressing the insufficiency of evidence to prove implied malice illustrate what type of prior misconduct evidence is admissible under section 1101 in a prosecution for murder based on driving under the influence of alcohol. Those cases demonstrate the prosecution cannot simply introduce bare bones evidence of a person's convictions for traffic infractions or accidents. It must demonstrate specific conduct performed by the accused

which inferentially would lead the jury to the conclusion Mason knew his driving "created a substantial risk to human life and consciously disregarded that danger." (*People v. Contreras, supra*, at p. 957.)

In this case, however, the evidence presented on the implied malice element of murder fell fall short of the requirements of section 1101. The prosecutor contended Mason's "numerous contacts with law enforcement and the criminal justice system regarding traffic violations" demonstrated he "could only become aware that there were reasons for the prohibition against this type of anti-social conduct and the type of driving that ultimately endangers other community members and is therefore prohibited." (RT 1605.) To the contrary, Mason's traffic history only demonstrated he had not "ultimately endanger[ed] other community members...." (*Contreras, supra*, at p. 957.)

This prior misconduct evidence did not tend to "directly ... establish the crime charged by proving a material fact." (*People v. Bergschneider, supra*, 211 Cal.App.3d at p. 160.) Instead, what the evidence lacked for in specifics, it made up for in generalities. It simply demonstrated conduct which almost any driver has engaged in at some given point--consciously or not--while driving, such as driving through a stop sign, failing to yield to a pedestrian, or the hazards of tailgating. It did not demonstrate the subjective knowledge component of implied malice.

38

Evidence of prior bad acts must possess some "precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered." (*People v. Thompson* (1980) 27 Cal.3d 303.) Otherwise, the evidence cannot provide a "reasonably strong" link in the requisite chain of inferences. (*Ibid.*) As there was no precise element of similarity between the offenses and thus no reasonably strong link in the required chain of inferences, the evidence was inadmissible under section 1101. Review should be granted to determine the limits on evidence of prior bad acts admitted to prove implied malice in a drunk-driving murder case.

Review is important because the error in this case was prejudicial. When evidence is admitted for a limited purpose, the trial court should admonish the jury of that fact. While the trial court in this case sometimes explained the limited purpose of evidence when it was admitted, it did not do so when the prosecutor introduced evidence of the Blanco Road accident. The court should have instructed with CALJIC 2.50, advising the jury it could not convict Mason based upon evidence of his "bad character." (*People v. Ortiz, supra,* 109 Cal.App.4th at p. 111.) The trial court failed to do this. Thus, when the prosecutor urged the jury to convict, arguing the evidence of Mason's prior bad acts showed Mason's propensity to commit this type of crime, the jury hardly could avoid using the evidence in the same way. (See e.g., RT 1590, 1637.)

39

This is true because the jury's passions were inflamed by the prejudicial nature of the evidence. Additionally, believing Mason had a propensity for such conduct, their urge to convict would have been stronger because he had evaded responsibility and punishment in the Blanco Road accident.

Review also is necessary to determine when the erroneous admission of evidence concerning prior bad acts violates due process. "An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence." (*Bruton v. United States* (1968) 391 U.S. 123, 131, fn. 6.) In *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378 the Ninth Circuit Court of Appeals held the introduction of evidence of "other bad acts" was irrelevant to any consequential fact and therefore violated the Due Process Clause. McKinney was tried for murdering his mother. A knife was the instrument of death. The coroner said the stab wounds could have been made by almost any kind of knife. (*Id.* at p. 1381.) The murder weapon was never found.

In an effort to prove McKinney was the murderer, the prosecution introduced evidence that McKinney had a fascination with knives, had a knife collection, and had possessed dagger-type knives on other occasions. The prosecution also introduced evidence that McKinney had used a knife to scratch the words "Death is His" on a closet door. (*Id.* at p. 1382.)

40

The federal court of appeals held this evidence was irrelevant to any fact of consequence in the case. Its sole relevance was based on propensity: McKinney was the likely knife-murderer because he liked knives. (*Id.* at pp. 1382-1383.)

> It served only to prey on the emotions of the jury, to lead them to mistrust McKinney, and to believe more easily that he was the type of son who would kill his mother in her sleep without much apparent motive. (*Id.* at p. 1385.)

Since the jury could draw no permissible inferences from this evidence, and the evidence was emotionally charged, the *McKinney* court ruled its admission violated the Due Process Clause under the circumstances of that case. (*Id.* at pp. 1385-1386.)

Similarly here, the jury could draw no permissible inferences from the Blanco Road evidence and thus its admission equally violated due process. As demonstrated above, the evidence was irrelevant to any consequential issue in the case. It was used to lead the jury to draw an impermissible inference, that Mason had a propensity to drive when drunk. The evidence "served only to prey on the emotions of the jury." (*Ibid.*) Thus, here as in *McKinney v. Reeves,* admission of this challenged evidence violated the Due Process Clause. (*Id.* at pp. 1385-1386.)\

The Blanco Road accident evidence was not introduced for a limited purpose. Without a restriction on the jury's use of such evidence, the

prosecutor could--and did--argue that the jury could infer the charged offenses were committed by Mason because he had the propensity to commit such offenses. (RT 1670.)  The evidence depicted him as a selfish, callous, and insensitive man who contrived defenses.  The jury likely used this evidence to convict Mason of the murder charges because Mason was a bad person who drank and drove, causing multiple deaths, and then contrived excuses for his drinking. The Blanco Road evidence deprived Mason of a fundamentally fair trial, guaranteed under the Due Process Clause. (*Estelle v. McGuire* (1991) 502 U.S. 62.)

While the jury received a general limiting instruction (RT 1648), the jury could not have understood it to apply to the Blanco Road evidence. Unlike other evidence presented on the subjective knowledge element of implied malice, the jury was not admonished as to the limited purpose of the Blanco Road accident when it was introduced in the prosecution's case in chief.  Thus, after the prosecutor elicited the Blanco Road evidence, the jury would naturally use the evidence as improper character evidence, just as the prosecutor urged them to do.

> And I submit to you, Ladies and Gentlemen, Mr. Mason has claimed that before and the People put on evidence for this jury to show that the defendant has been in a similar situation, has been in an accident in which law enforcement were going to be there, were going to come out and has left the scene.  And when returning to have contact with law enforcement, that was most

42

certain as far as his involvement in that accident.
He needed an explanation as to what would be
the odor of alcohol on his breath, what would be
physical symptoms of being under the influence.
(RT 1590.)

The defendant got the heck out of there a lot
sooner than what he claims to be a twenty-minute
wait when no one was around. He got out of
there a lot sooner than that. [Par.] And I submit
to you, Ladies and Gentlemen, as evidence of
what is a very selfish and cowardly man, a selfish
and cowardly man who does not care about the
safety of others, who cares about one person only,
and that's himself, who leaves people in a car hurt
and dying, doesn't care about anybody but
himself. And *he intentionally commits acts that*
*are dangerous to other people because he doesn't*
*care about anyone but himself. He disregards*
*that danger to other people, disregards it.* (RT
1636-1637, italics added.)

As is evident from her summation, the prosecutor submitted the Blanco

Road evidence under the "guise of impeachment" (*People v. Zambrano*

(2004) 124 Cal.App.4th 228, 293) in order to bring propensity evidence

before the jury, when it was undisputed the driver of the Jeep had caused the

accident. The prosecutor's questions only served to imply Mason knew he had

been drinking and driving and thus caused the Blanco Road accident. Further,

even though Mason denied her accusations, the prosecutor had no evidence

to support the prejudicial implications of the questions she asked Mason, such

as evidence the CHP officers had given him field sobriety tests at the scene,

that he had been charged with responsibility for the accident because of his

43

drinking or reckless driving, or even presenting testimony from Joshua Miller that Mason had told him he "wanted to get out of there because [he] had been drinking and driving" that night. (RT 1575.)

Review is necessary to determine whether under these facts Mason was deprived of his constitutional right to a fair trial.

Review also is necessary to determine whether counsel provided ineffective assistance when he failed to request an instruction limiting the jury's consideration of evidence concerning the Blanco Road incident. During closing argument, defense counsel argued the Blanco Road evidence should not be used by the jury to convict Mason because of his propensity for these type crimes.

> And the prosecution tries to paint him into a corner using that, not to show that there is particular knowledge, just to kind of paint this with a broad brush, well, *here's another situation where he drove, drank and drove. You can't do that. That's not right. That's not fair. That's not a situation where you can draw those kinds of implications here.* (RT 1101, italics added.)

Rather than argue about the relevance of this evidence, counsel should have asked for the standard instruction limiting the consideration of evidence of other bad acts. (See CALJIC No. 2.50.) Given his closing argument, counsel had no rational tactical purpose for failing to seek a limiting instruction. This failure constituted ineffective assistance of counsel.

[T]he jury is informed that there are three components to the trial — evidence presented by both sides, arguments by the attorneys and instructions on the law given by the judge. Jurors are told that their decision must be based on the facts and the law and if counsel says anything that conflicts with the instructions that are given by the judge, they must follow the instructions." (*People v. Miller* (1996) 46 Cal.App.4th 412, 426.)

Here, the instructions did not advise the jury that Mason's conduct in the Blanco Road accident could only be considered for a limited purpose. Since the court placed no limit on this evidence, it is likely the jury did not either. Counsel's closing argument was no replacement for a limiting instruction.

The failure to ask for an instruction limiting the jury's consideration of highly prejudicial evidence constituted ineffective assistance of counsel in violation of appellant's Sixth Amendment right to counsel. (*United States v. Myers* (7th Cir. 1990) 892 F.2d 642, 648-649.) In *Myers*, a co-defendant's statement implicating Myers was admitted in evidence. Counsel failed to request a limiting instruction advising the jury the co-defendant's statement could not be considered against Myers. The Court of Appeals held defense counsel provided constitutionally deficient representation by failing to request such an instruction.

The government argued counsel possibly failed to request a limiting instruction because "it would just have drawn attention to the incriminating

character of the statement." (*Id.* at p. 648.) The court rejected this speculation.

> If a cautionary instruction would be ineffectual, this strengthens the case either for a more thorough editing of the statement, or for a severance, which would have resulted in a separate trial of Myers in which Neal's statement would not have been admissible at all. (*Ibid.*)

Myers's conviction was reversed. (*Id.* at p. 649.)

In this case, there is equally no rational tactical reason for counsel's failure to request a limiting instruction. The failure cannot be explained by a fear such an instruction would only draw the jury's attention to the damaging evidence. Counsel himself drew the jury's attention to the evidence. (See RT 1101.) Just as in *Myers*, counsel's failure to request a limiting instruction constituted ineffective assistance of counsel. (See also *Gray v. Linn* (5th Cir. 1993) 6 F.3d 265, 268-269 [counsel provided ineffective assistance in failing to object to erroneous instruction concerning elements of attempted murder]; *Kubat v. Thieret* (7th Cir. 1989) 867 F.2d 351, 869-871 [death penalty reversed due to counsel's failure to object to erroneous penalty phase instruction].)

Review should be granted to consider the important issues raised by the erroneous admission of evidence concerning prior bad acts.

46

Filed 9/7/06  P. v. Mason CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H028624 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS033582) |
| v. | |
| SHAVOUGUE ANTOINE MASON, | |
| Defendant and Appellant. | |

Defendant Shavougue Antoine Mason was sentenced to 45 years to life in state prison. He was convicted of killing Rene Porras, Rosalinda Gonzales, and the couple's unborn child, when he drove at excessive speed through a stop sign under the influence of alcohol on December 4, 2003. On appeal, he challenges the sufficiency of the evidence of mental state, the admissibility of his driving history of Vehicle Code violations and accidents, and a jury instruction which created "an impermissible conclusive presumption in violation of [defendant's] right to due process of law."

### FACTS

Around noon on December 4, 2003, City of Salinas employees Jose Zepeda and Raul Zagal were parked at the curb of Park Street between Villa and Homestead Streets, when they heard a vehicle approaching them eastbound on Park Street. A green car passed them at a speed both estimated to be over 60 miles per hour. Zepeda got a good look at the driver and later identified him as defendant.

Park Street runs east-west and has stop signs at each intersection which permit north-south traffic to flow unimpeded. The neighborhood is a high-density residential area with a 25 mile per hour speed limit. Zepeda watched the green car accelerate to about 75 miles per hour though the intersection of Park and Homestead Streets without attempting to stop at the stop sign. The vehicle had reached about 80 miles per hour when it entered the next intersection at West Street, again making no attempt to stop at the stop sign. Zepeda lost sight of the green car between West Street and the third intersection at Riker Street.

Bruce Laine was driving on West Street approaching the Park Street intersection when he saw a vehicle traveling more than 60 miles per hour "fl[y] through the stop signs at Park and West Street" and collide with a BMW traveling about 20 miles per hour southbound on Riker Street. Rene Porras was the driver of the BMW; eight-months pregnant Rosalinda Gonzales was the front seat passenger, and three-year-old Rene Porras, Jr., and five-year-old Joshua Perez were in the backseat.

Defendant's car, a Volkswagen Passat, which had been traveling eastbound on Park Street, came to rest in the middle of the intersection with Riker Street facing westbound. The BMW came to rest against a residence. A third vehicle was struck by the BMW as it careered toward the residence; it sustained only minor damage.

Defendant's airbag deployed. He stayed inside his car for 10 to 20 seconds, then slowly emerged looking both "very weary" and "very stunned." He walked to the BMW, leaned over and looked briefly into the car through the passenger side window, and then either walked rapidly or ran away from the scene. He went to the apartment he shared with his girlfriend, Misty Flores, about 1/10th of a mile from the scene, and had her call 911. Police took him into custody shortly thereafter. Police found a three-quarter full bottle of Bacardi Silver Raz, a raspberry-flavored rum drink with the alcohol content of beer, on the kitchen counter. An empty 750 mm bottle of Hennessey cognac was found in the VW's trunk compartment.

2

When police officers took defendant into custody, he smelled moderately of alcohol and had "somewhat glassy and red" eyes. He was given field sobriety tests at the police department at 1:15 p.m., causing an officer to conclude he was under the influence of alcohol. Defendant's blood alcohol level at that time, measured with a hand-held breath screening device, was 0.13. A blood sample drawn at 1:50 p.m. yielded a blood alcohol level of 0.19 percent. At trial, a criminalist testified that the hand-held screening device does not necessarily accurately measure alcohol that might be in a person's system, depending on whether the subject has blown long enough or hard enough to get to the deepest air in the lungs. The criminalist testified that based on the two test results, defendant's blood alcohol level at noon, just before the accident, was 0.23.

Porras died as a result of major head injuries. Gonzales, who could not be taken from the car until part of it had been cut away, died from a broken neck exacerbated by significant blood loss from a ruptured uterus. The fully-developed female fetus being carried by Gonzales died from asphyxiation brought on by the terminal injuries to Gonzales. Rene Porras, Jr., suffered a fractured tibia and Joshua Perez escaped with bruises and scrapes.

Conclusions based on a reconstruction of the accident were: (1) defendant's vehicle had no mechanical problems that would have contributed to the accident; (2) defendant's speed at impact was 46.28 miles per hour and the speed of the BMW was 20.16; and (3) defendant's car had not stopped at the stop sign at the site of the collision, Riker and Park Streets. An expert testified that "impact speed" is not the speed at impact; it is the speed "where the crushing stops." Defendant's speed prior to impact would have been greater than 46.28 miles per hour.

Defendant stood trial on a nine-count information alleging three counts of murder (Pen. Code, § 187, counts 1-3);[1] two counts of gross vehicular manslaughter while

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

intoxicated (§ 191.5, subd. (a), counts 4-5) and two counts of vehicular manslaughter with gross negligence (§ 192, subd. (c)(1), counts 6-7) with the allegations that defendant fled the scene after committing the offenses alleged in counts 4, 5, 6, and 7 (Veh. Code, § 20001, subd. (c)); driving under the influence of alcohol causing injury (*id.*, § 23153, subd. (a), count 8); and driving with a blood alcohol level of 0.08 and above (*id.*, at subd. (b), count 9). Counts 8 and 9 also carried the allegations that defendant personally inflicted great bodily injury on Rene Porras and Rosalinda Gonzales in their commission (§ 12022.7, subd. (a)), and that he personally inflicted great bodily injury upon Rene Porras, Jr., a child under the age of five years (*id.*, at subd. (d)).

At the jury trial, defendant testified that he was working as a night auditor/manager at the Monterey Beach Resort in December 2003, and that he had been working overtime eight-hour night and day shifts that month. On December 4, he woke up early after a few hours sleep and took the child of a family friend to school. He then went to a friend's house, stayed there for a while, and then gave his friend a ride somewhere, after which he decided to go home and lie down because he was tired. It was about 11:45 a.m. Driving at about 25 miles per hour, he turned onto Park Street from Villa Street, did a "bump stop" at Homestead and Park Streets, dozed off as he passed Homestead, and awoke just before the collision. He slammed on his brakes, but crashed into the BMW's passenger door.

Defendant's air bag deployed. He did not become unconscious, but sat in his car stunned, and then climbed out and went to the other car. Everybody was unconscious except the two children who were crying. He had to "actually ask the kids to calm down because I couldn't get them out of the car. . . . I told them to wait until the police came." Defendant explained he did not try to get the children out of the car before the police or an ambulance came "[b]ecause I have medical training and you're not supposed to touch people until medical people get there." There was a lady standing in the yard and defendant asked her to call 911. She was speaking Spanish. Defendant stated he was

4

hysterical. He did not see anyone else around although Zepeda and others who observed him driving were coming to the scene. When the lady "didn't respond, I just basically panicked and I said I was going to my house to call the police." He ran home and told his girlfriend, "I need to call 911. Call 911."

Defendant denied having anything to drink before the collision but drank only after it. After he told Flores to call the police, he got a half-full pint bottle of Hennessey cognac out of a cabinet and "just turned it up and drunk [sic] it" all. He also took some sips from a Bacardi Silver as well, but that was while he was on the phone with the dispatcher. While he was still on the phone with the dispatcher, there was a knock on the door. Police were waiting for him downstairs. He left the apartment to meet them and was immediately handcuffed. After he had been outside for a while, he began to feel the effects of the alcohol he had drunk at home.

Defendant admitted going "a few" miles per hour over the speed limit, but he did not believe he was going between 60 and 80 miles per hour. He acknowledged that going at a high speed through an intersection was "possibly" dangerous to others, that unsafe speed could kill, and that driving under the influence was dangerous. He described himself as hysterical and panicked after the collision and said he drank the brandy to calm his nerves.

Flores corroborated she called 911 for defendant and provided him with alcohol. She said defendant told her he did not know if anyone had been hurt in the accident. Flores's son testified about putting a liquor container in a dumpster. Officer John Lynn testified Flores told him defendant drank a 12-ounce bottle of Bacardi Silver plus a few sips from a second bottle. The first went into the dumpster and the second was taken by police. Flores stated there had been no bottles of Hennessey in the apartment.

On February 7, 2005, the jury found defendant guilty of all counts and found true all allegations except great bodily injury on Rene Porras, Jr. This appeal ensued.

## ISSUES ON APPEAL

Defendant contends: (1) the murder convictions must be reversed because the evidence was insufficient to establish the mental element of second-degree murder, implied malice; (2) the trial was fundamentally unfair and violated defendant's right to due process because in admitting his driving history, the trial court admitted prejudicial evidence of other bad acts which was irrelevant to the issue of the subjective knowledge element of implied malice murder; (3) the murder convictions must be reversed because the trial court violated defendant's right to due process of law by instructing the jury that any violation of California's basic speed law constituted an act dangerous to human life which created an impermissible conclusive presumption; and (4) the driving under the influence causing injury conviction must be reversed because it is a lesser included offense to the conviction for vehicular manslaughter while intoxicated with gross negligence. The People concede that count 8, a lesser included offense of vehicular manslaughter while intoxicated with gross negligence, must be stricken in light of *People v. Miranda* (1994) 21 Cal.App.4th 1464, 1467-1469. We will so order.

### SUFFICIENCY OF THE EVIDENCE OF IMPLIED MALICE

Defendant contends the evidence was insufficient to establish implied malice because the evidence presented by the prosecution, namely, past convictions of traffic violations, an alcohol-related reckless driving, an automobile accident in which he had been at fault, and an accident on Blanco Road in which he was not at fault but in which his friend, driving behind him in his own vehicle, was killed, "fell far short of proving [defendant] 'subjectively knew his driving created a substantial risk to human life and consciously disregarded that danger.' "

The Blanco Road evidence came from the California Highway Patrol officer who investigated it and defendant's testimony. The officer arrived on the scene in the early morning hours of March 18, 2001, and saw a heavily damaged blue Jeep with an unconscious driver blocking Blanco Road. A heavily damaged red car contained the

remains of its driver, defendant's friend Abad Hughes, who was killed in the accident. Hughes's body was "hanging out of the driver's side from his waist where the window starts and then his head was smashed into the ground" with "brain matter [splattered] across the road." Defendant's car, a gray Dodge Stratus, was in a ditch off the shoulder further along Blanco Road, and had also been involved in the accident. Defendant stated he had been driving ahead of Hughes when he saw the Jeep approaching him on the wrong side of the road, and he swerved to the right to avoid it, but could not. The Jeep hit defendant's car and knocked it off the road. The Jeep continued in the wrong lane of traffic and crashed into Hughes's car.

On cross-examination of defendant, the trial court allowed the prosecutor to elicit evidence that when a car came upon the scene, defendant had the driver, whom he knew slightly, take him home to call the police. While he was there, he had "a couple sips" of banana rum. The dispatcher asked him to return to the scene. Once there, defendant talked to an officer who asked him about the alcohol she smelled on his breath. He explained that while he was home, he had "a couple sips" from "a fifth bottle."

The prosecutor also presented evidence that on October 6, 1999, defendant was responsible for an accident which occurred when motorist John Jones was slowing to make a left-hand turn on Main Street in Salinas. Defendant's car struck the right rear portion of Jones's vehicle causing between $2300 and $2400 worth of damage. Defendant's car kept going around a corner and stopped. Jones followed and saw that defendant's car had sustained equal or possibly greater damage than his.

The alcohol-related reckless driving occurred on March 26, 1993. Marina Department of Public Safety Officer James Clagg observed the left-hand turn signal of defendant's vehicle blinking while he was in "a straight-only lane." That street had a left-turn lane, so Clagg thought defendant was going to turn left from an improper position. However, defendant stopped at the green light and sat there with his turn signal blinking through the next traffic light cycle. Cars went around defendant to proceed

7

through. When the light turned green the second time, defendant turned off his signal and went straight through the light. Clagg stopped defendant and detected a moderate to strong odor of alcohol on his breath, slow but not slurred speech, and red and watery eyes. When defendant got out, he had to hold on to the side of the door and the door frame. When he walked, he was "kind of straggling." Defendant failed the field sobriety tests. Defendant ultimately was convicted of an alcohol-related ("wet") reckless driving. (Veh. Code, § 23103.5.)

Defendant's additional driving record consisted of the following convictions: six for speeding on November 29 and December 11, 1995; October 31, 1996; May 1 and August 7, 1997; and February 9, 2001; one for disobeying a traffic signal on February 13, 1996; and one for failure to yield to a pedestrian in an intersection on April 16, 2001.

In reviewing the sufficiency of the evidence, the appellate court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence--that is, evidence which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "[U]nder the usual standard of the substantial evidence rule, [the reviewing court] resolv[es] all conflicts in evidence and questions of credibility in favor of the verdict, and indulg[es] every reasonable inference the jury could draw from the evidence." (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.)

Implied malice second degree murder is committed "when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' ". . . .' [Citations.] Phrased in a different way, malice may be implied when [a] defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson*).) "[W]hen the

8

conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied." (*Id.* at p. 298.) "Implied malice requires proof the accused acted deliberately with conscious disregard for life" (*People v. Contreras* (1994) 26 Cal.App.4th 944, 954 (*Contreras*)) based on a "determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*Watson, supra,* 30 Cal.3d at pp. 296-297.)

Defendant cites *Contreras, supra,* 26 Cal.App.4th at page 948 among other cases to "illustrate[] why the prosecution's evidence cannot support the implied malice finding needed for a murder conviction in this case. In *Contreras* the prosecution established not only that Contreras had been cited for numerous violations of the Vehicle Code, it also established what conduct constituted those violations. (See, e.g., *id.* at pp. 949-950 [58 mph in 35 mph zone; 85-90 mph on the freeway and driving recklessly; speeding, unsafe lane changes and tailgating in a residential area; almost causing 'several traffic accidents'[;] almost causing accident and reckless driving arrest while driving 90-100 miles per hour and weaving through traffic[;] and police officer's admonishment that Contreras's reckless driving could lead to a traffic fatality].) The evidence also established Contreras had been racing with other tow trucks when the deadly accident occurred. On this evidence the appellate court concluded, 'Based on his driving record, his prior accident, and the known inadequacy of his brakes on the date in question, the issue was not whether Contreras would have a serious traffic accident, but when.' (*Id.* at p. 956.) Thus the appellate court had no difficulty finding the evidence sufficient to show Contreras 'subjectively knew his driving created a substantial risk to human life and consciously disregarded that danger.' (*Id.* at p. 957, citations omitted.)"

Defendant finds his own driving "[i]n striking contrast." As he describes it, his driving consisted of "driving over the legal limit through a residential area and . . . not stop[ping] at three posted stop signs. There was no evidence of any erratic or evasive driving on his part, no near misses with other cars or pedestrians in the street. Although