witnesses estimated his speed as high as 80 miles per hour, his speed at impact was 46.2 m[iles per hour], allowing a reasonable inference that as [defendant] neared the intersection of Park and Riker Streets he had already reduced his speed, further reducing it when he braked as he became aware of the BMW in the intersection, or that he had not been traveling as fast as witnesses had speculated.

"Further, [defendant's] convictions related to speeding, failure to yield to a pedestrian in a crosswalk, and failure to obey a traffic sign[,] only demonstrated [defendant] had committed these Vehicle Code violations. It [sic] did not establish . . . [defendant's] speed leading to the citation, whether he had caused any accidents with other people or property, or even if he had nearly missed hitting people or property. While his conviction for alcohol-related reckless driving stemmed from his conduct while driving, that conduct did not consist of speeding, driving erratically, or almost causing an accident.

"Although [defendant] had been involved in two accidents, he had not been at fault in the accident that claimed his friend's life [the Blanco Road incident]. The other accident [with John Jones] involved a non-fatality accident and again, [defendant] had not been cited for speeding or reckless driving as a cause of the accident, nor of drinking and driving. Finally, there was no evidence [defendant] attended any driver education program demonstrating the dangers inherent when drinking and driving."

Substantial evidence--of defendant's conduct on the day in question, of defendant's admissions, and of his history of dangerous driving--supports the jury's finding that defendant "*actually appreciated* the risk [of danger to the lives of others] involved" (*Watson, supra,* 30 Cal.3d at p. 297) in drinking and driving, speeding (60-80 mph in a 25 mph zone), and running stop signs.

Expert testimony placed defendant's blood alcohol level at 0.23 at noon, just before the collision. Defendant admitted under cross-examination that he was driving "a few miles" over the speed limit; he did not come to a complete stop at the Homestead

intersection; and he dozed off just before the collision. He also stated he knew it was dangerous to the lives of others to drive while under the influence, that he knew there was possible danger to others when one drives at a high speed through an intersection, and that he knew driving at an unsafe speed could kill. Defendant's conduct immediately after the accident (looking into the BMW and seeing unconscious adults and crying children, doing nothing to help them, running home, and drinking a substantial amount of alcohol before and while talking to the dispatcher) supported the inference of a consciousness of guilt that his dangerous driving while intoxicated resulted in harm to the victims. Furthermore, defendant's consuming alcohol immediately after the accident and telling the 911 operator that he had just started drinking reasonably supports the inference he consciously attempted to mislead the investigators and make irrelevant the results of the blood alcohol test. Finally, in light of the true finding of the allegation that he fled from the scene, evidence of flight supports an inference of consciousness of guilt. (§ 1127c.)

Defendant's driving history entitled the jury to infer that regardless of the circumstances surrounding a prior instance of reckless driving, "the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and understanding of the personal and social consequences of such behavior." (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 115 (*Ortiz*).) In this case, defendant's driving history and his subsequent failure to conform his conduct to statutory norms is evidence supporting an inference of malice because it reflects actions done with a subjective awareness of danger greater than that of other drivers, and a willingness to commit the acts anyway. (*Id.* at pp. 115-116.) Even the Blanco Road accident for which defendant was not charged and in which his friend was killed supports an inference by a rational jury that the totality of defendant's past experiences gave him the knowledge to appreciate the risk to human life of a driver's failure to conform his conduct to the rules

11

governing the operation of a vehicle, despite which defendant acted deliberately with conscious disregard for life. (*Watson, supra*, 30 Cal.3d at p. 296.)

DEFENDANT'S DRIVING RECORD--OTHER "BAD ACTS"

Next, defendant complains his trial was fundamentally unfair and violated his right to due process, because the evidence of his driving history to prove implied malice admitted under Evidence Code section 1101, subdivision (b),[2] and his conduct after the Blanco Road accident on the issue of credibility and for impeachment (§ 1101, subd. (c)) was irrelevant and prejudicial. The trial court admitted the Blanco Road evidence (with the exclusion on direct examination of defendant's post-accident use of alcohol) over defendant's objection because it demonstrated defendant's "first-hand lesson in the danger of unsafe driving and the consequences to human life," even though defendant did not cause the accident.

Defendant complains "[t]here is no lesson to be learned 'first hand' when one's own conduct does not cause the accident." "Since the Blanco Road evidence did not show [*defendant*'s] driving 'sensitize[d]' him 'to the dangerousness of such life-threatening conduct,' the evidence should have been excluded." (Italics defendant's.) He adds, "[t]he sum of the evidence only branded [defendant] as a miscreant. Further, even if the evidence of [defendant's] post-accident drinking after the Blanco Road accident was admissible under section 1101, subdivision (c), the evidence was inadmissible under Evidence Code section 352 because it uniquely served to evoke an emotional bias against

---

[2] Further statutory references in this section are to the Evidence Code. Section 1101, subdivision (b), provides: "Nothing in this section [(1101)] prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act." Subdivision (c) provides: "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

[defendant] and had little effect on the issues. These errors were exacerbated because the jury was not given an appropriate limiting instruction at the end of trial."

"It has long been the rule, of course, that evidence of uncharged misconduct is inadmissible to establish a defendant's *propensity* to commit the offense charged. The bar on the use of such 'propensity evidence' is not that it lacks relevance. Rather, it is the concern that such evidence may be regarded by the trier of fact as *too* relevant, 'provoking,' as Wigmore has it, 'an overstrong tendency to believe defendant guilty' based on the commission of the *prior* acts rather than those charged in the pending prosecution. In short, the evidence is barred to prevent conviction based upon the defendant's 'bad character.' [Citations.] California's Evidence Code codifies this bar in section 1101, subdivision (a) (section 1101(a)). That provision makes flatly inadmissible 'evidence of a person's character or a trait of his . . . character . . . when offered to prove . . . conduct on a specified occasion.' [Citations.]" (*Ortiz, supra*, 109 Cal.App.4th at p. 111.)

*Ortiz* continues, "The *exceptions* to the bar on the admissibility of such evidence of uncharged acts are equally well established. Codified as subdivision (b) of section 1101 (section 1101(b)), the rule has long been that evidence of uncharged misconduct *is* admissible where relevant to prove 'some fact (such as motive, opportunity, intent, preparation, plan, *knowledge*, identity, absence of mistake or accident . . .) other than [a defendant's] disposition to commit such an act.' [Citation, italics added by *Ortiz.*] We emphasize the word 'knowledge' in the foregoing statutory enumeration because, in seeking admission of the uncharged misconduct evidence at defendant's trial, it was the prosecution's contention that the evidence was relevant because it tended to establish a subjective awareness on the part of defendant of the disastrous consequences that can follow in the wake of recklessly operating a motor vehicle on a public highway. As tending to establish, in other words, defendant's *knowledge*--gained in the course of the prior misconduct--of the natural consequences, dangerous to life, of the reckless

operation of a motor vehicle, and of his persistence in that behavior, thus evidencing a conscious disregard for the lives of others on the road.  These mental features, of course, comprise the mens rea of implied malice, thereby supporting an accusation of second degree murder." (*Ortiz, supra,* 109 Cal.App.4th at pp. 111-112.)

To be admitted under section 1101, evidence of uncharged crimes must be material; it must have a tendency to prove or disprove the material fact; and it must not meet the criteria of any rule or policy requiring exclusion of relevant evidence, e.g., Evidence Code section 352. (*People v. Sully* (1991) 53 Cal.3d 1195, 1224.) " ' "Since 'substantial prejudicial effect [is] inherent in [such] evidence,' the uncharged offenses are admissible only if they have substantive probative value. [Citation.]" ' [Citation.]" (*Ortiz, supra,* 109 Cal.App.4th at p. 116.)

"Critical to this second inquiry is the relaxed standard under which an appellate court reviews evidentiary determinations by the trial court--the familiar 'abuse of discretion' standard. [Citations.]  What Witkin terms the 'classic statement' of the contours of the trial court's discretionary power appears in the early case of *Bailey v. Taaffe* (1866) 29 Cal. 422, 424, where the court wrote that the ' "discretion intended . . . is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles.  It is not a mental discretion, to be exercised *ex gratia,* but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." ' [Citation.]" (*Ortiz, supra,* 109 Cal.App.4th at p. 117.)

Defendant complains here that the Vehicle Code violations comprising his driving history did not prove a material fact, that is, the subjective knowledge component of implied malice.  The prosecutor's "bare bones" evidence of defendant's convictions for traffic infractions or accidents were intended, as she said, to "demonstrate[] he 'could only become aware that there were reasons for the prohibition against this type of anti-social conduct and the type of driving that ultimately endangers other community

members and is therefore prohibited.' " Defendant claims this history "only demonstrated he had not 'ultimately endanger[ed] other community members . . .' [Citation.] [¶] . . . It simply demonstrated conduct which almost any driver has engaged in at some given point--consciously or not--while driving, such as driving through a stop sign, failing to yield to a pedestrian, or the hazards of tailgating."

Whether defendant's official driving record is similar to that of "almost any driver," the facts presented by the prosecutor--that defendant was caught in violations involving the safe operation of a motor vehicle on 10 occasions, plus a "wet" reckless driving and a collision with John Jones--that he was brought before the court and convicted of each offense and required to pay a penalty--is evidence from which the jury could infer that past experience had warned him that speeding, failing to yield to a pedestrian, failing to stop at a stop sign, and driving under the influence of alcohol, created a substantial risk to human life.

"Psychologically speaking, the insights of the courts in these cases [where other evidence shows a wanton disregard for life and the facts demonstrate a subjective awareness of the risk created] seem little more than commonplace, intuitively familiar to most. A jury is entitled to infer that regardless of the mental state or condition that accompanies an instance of reckless driving--whether intoxication, rage, or willful irresponsibility--the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and understanding of the personal and social consequences of such behavior. The lesson in these many cases was not lost on the trial court . . . . [As the trial judge stated from the bench,] '[e]very time the defendant drove badly before he allegedly committed these two murders,' . . . 'and every time he was convicted or arrested or punished in some fashion, *his awareness of the dangers of driving badly increased* and that is what the district attorney has a legitimate right to try to prove . . . [did] this defendant have implied malice in his mind or not when he drove the way he did, and that is a subjective standard. So we have to find out what he was exposed to that

15

most people aren't exposed to in order to understand his level of awareness of the dangers of driving badly.' (Italics added [by *Ortiz*].)" (*Ortiz, supra,* 109 Cal.App.4th at pp. 115-116.)

Our jury, also, could reasonably infer that on this occasion as defendant sped through several stop signs after having been drinking, he was aware of the risk to safety of which he had been warned on more than 10 occasions and which he was then consciously disregarding. This evidence formed a basis from which the jury could evaluate whether defendant's knowledge as informed by past events when applied to the facts of the instant case demonstrated the implied malice necessary to find second-degree murder.

Next, defendant complains that the prosecutor used her Blanco Road cross-examination (for excerpts, see Addendum, *post*) to elicit details that were irrelevant since defendant admitted that he had had something to drink after that accident. The prosecutor used this evidence "to unfairly malign [defendant] in the eyes of the jury. [His] denials could not erase the implications, voiced loudly in the prosecutor's summation, that [defendant] was nothing better than a liar, a man who drinks and drives, causes accidents and death, and thinks only of how he can evade responsibility for his actions. In other words, a person of bad character and propensity to commit these type[s] [of] crimes." This evidence caused an undue consumption of time and should have been excluded as " ' "uniquely tend[ing] to evoke an emotional bias against . . . [one party] as an individual and which has very little effect on the issues." ' " (*People v. Garceau* (1993) 6 Cal.4th 140, 178.)

First, defendant's driving conduct on Blanco Road was not admitted under section 1101(b), as uncharged bad acts evidence. Defendant was not accused of culpability in that incident, and there was no evidence that he drove in a manner that was unsafe. However, the incident, in all its tragic detail, was relevant to defendant's state of mind. On Blanco Road, defendant experienced the results of someone else's unlawful drinking

and driving which put him in immediate danger and from which he narrowly escaped; which caused the death of his friend whose body was "hanging out of the driver's side from his waist where the window starts and then his head was smashed into the ground" with "brain matter [splattered] across the road"; and which injured the culpable driver who was pinned in his vehicle, unconscious. The experience was relevant on the issue of defendant's knowledge and subjective awareness that unlawful operation of a vehicle could result in death to other persons. The fact that the person killed was a friend supported the further inference that the death would have a heightened impact on defendant's subjective awareness.

Furthermore, under Evidence Code section 1101, subdivision (c), the Blanco Road evidence was also offered for the "far narrower purpose of showing the implausibility and untruthfulness of defendant's testimony in the [instant] case. [Citation.] [¶] . . . The jury could readily find that defendant's credibility in the present case was diminished by the fact that he offered the same explanation for [alcohol on his breath in the Blanco Road accident]." (*People v. Millwee* (1998) 18 Cal.4th 96, 131 (*Millwee*).)

As in *Millwee*, "[t]he trial court could properly conclude that the [Blanco Road testimony] was highly probative on the limited credibility issue for which it was offered, that defendant's credibility was a crucial issue at trial, and that the potential for undue prejudice was slight under the circumstances." (*Millwee, supra*, 18 Cal.4th at p. 131.)

In connection with the Blanco Road evidence, defendant contends that the trial court should have instructed the jury with CALJIC No. 2.50, and that his trial counsel rendered ineffective assistance in failing to request the instruction. CALJIC No. 2.50, Evidence of Other Crimes, deals with the jury's use of evidence of crimes "other than that for which [the defendant] is on trial." This instruction was given before the prosecution presented evidence of defendant's traffic violations. At that time, the court instructed, "evidence is going to be introduced for the purpose of showing that the Defendant committed infractions. It is not used for any purpose other than that, for

17

which he is on trial, this evidence, if believed, may not be considered by you to prove that the Defendant is a person of bad character or that he has a disposition to commit crimes. [¶] It may be considered by you only for the limited purpose as determining if it tends to show the existence or the intent or mental state which is a necessary element of the crime of murder as charged in counts one, two and three. [¶] For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as all the other evidence in the case. You are not permitted to consider this evidence for any other purpose." The instruction, or a modified version of it to fit the Blanco Road evidence, was not given in connection with the Blanco Road evidence, nor did defendant request it.

Nevertheless, defendant argues his trial was unfair because the jury should have been admonished that the evidence was inadmissible to show that he was a person of bad character or that he had a disposition to commit crimes, which was precisely what he contends the prosecutor requested an admonition in closing argument.[3] Defendant asserts defense counsel was ineffective in failing to request a limiting instruction. In his closing argument, defense counsel stated, "[a]nd the prosecution tries to paint him into a corner using that, not to show that there is particular knowledge, just to kind of paint this with a broad brush, well, here's another situation where he drove, drank and drove. You can't

---

[3] The prosecutor stated that the Blanco Road evidence showed that the defendant "has been in a similar situation, has been in an accident in which law enforcement were [sic] going to be there, were [sic] going to come out and has left the scene. And when returning to have contact with law enforcement, . . . [h]e needed an explanation as to what would be the odor of alcohol on his breath, what would be physical symptoms of being under the influence."

"The defendant got the heck out of there a lot sooner than what he claims to be a twenty-minute wait when no one was around. He got out of there a lot sooner than that. [¶] And I submit to you, Ladies and Gentlemen, as evidence of what is a very selfish and cowardly man, a selfish and cowardly man who does not care about the safety of others, who cares about one person only, and that's himself, who leaves people in a car hurt and dying, doesn't care about anybody but himself. And he intentionally commits acts that are dangerous to other people because he doesn't care about anyone but himself. He disregards that danger to other people, disregards it."

do that. That's not right. That's not fair. That's not a situation where you can draw those kinds of implications here." Defendant observes, "[r]ather than argue about the relevance of this evidence, counsel should have asked for the standard instruction limiting the consideration of evidence of other bad acts."

The People state that CALJIC No. 2.50 "simply does not apply." The People say CALJIC No. 2.50 would have been error if given because it would have told the jury that defendant's conduct at Blanco Road was criminal even though the authorities did not treat it as such. Furthermore, "[t]he rebuttal . . . evidence was in direct response to [defendant's] mischaracterization of his conduct at 'Blanco Road.'[4] Further, the rebuttal evidence was, again, not bad-act evidence[.] [I]t was evidence not amounting to criminal misconduct but clearly relevant to [defendant's] subjective knowledge of the gravity of his acts. [Citation.] [¶] As such, neither an admonition nor CALJIC No. 2.50 was required."

The post-collision evidence was "evidence offered to . . . attack the credibility of a witness" (Evid. Code, § 1101, subd. (c)), and was offered for that limited purpose. An instruction à la *Millwee* would have been advisable. In *Millwee*, the trial court instructed that "such evidence had no bearing on defendant's character or disposition" (*Millwee*, *supra*, 18 Cal.4th at p. 131) but was admitted for the purpose of showing knowledge that defendant's driving posed a substantial risk to human life and that he proceeded with a conscious disregard of the danger, and on the issue of the plausibility and truthfulness of defendant's testimony. (See *ibid.*) As it was, defendant's prosecutor made a passionate appeal to the jury to find that defendant was a "selfish and cowardly man" who acted in accordance with this propensity and committed the instant crimes. The jury received no

---

[4] The People do not provide a citation to the record for the purported "mischaracterization." It is unclear what respondent was referring to. Possibly the People were taking issue with defendant's adamant and uncontradicted insistence that he had nothing alcoholic to drink before the Blanco Road accident.

guidance from the court on the proper uses of this evidence. This was error. In order to warrant a reversal, however, defendant must show prejudice. For that question, we turn to defendant's claim of incompetence of counsel.

Defendant asserts counsel's performance was deficient for failing to request the instruction. To prevail on a claim of ineffective assistance, a defendant must show not only (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, but also (2) that, as a result, the defendant was prejudiced, i.e., there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland*).)

In this case, defendant has not shown that he was prejudiced, that is, that there is a reasonable probability that, absent the alleged errors, the jury would have entertained a reasonable doubt respecting the defendant's guilt. (*Strickland, supra,* 466 U.S. at p. 695.) The evidence of the circumstances of the crime was overwhelming. Disinterested witnesses either observed defendant's preaccident speeding and red-light running or observed the collision itself. They also observed defendant's conduct after the accident when he left the scene. There was substantial evidence of defendant's inebriation at the time of the accident. Using breath and blood readings taken after the accident, the criminalist was able to extrapolate defendant's blood alcohol level just before the accident. At 0.23, defendant's blood alcohol level was well beyond the 0.08 level at which a driver is guilty of violating Vehicle Code section 23153, subdivision (b), driving with a blood alcohol of 0.08 or above. Evidence of implied malice was well established

20

as stated *ante*. In light of the totality of the evidence, it is not reasonably likely that the outcome would have been more favorable to defendant in the absence of the error.

## INSTRUCTION CREATING
## "AN UNCONSTITUTIONAL CONCLUSIVE PRESUMPTION"

Next, defendant asserts that the trial court violated his right to due process when the trial court instructed that the jury could find him guilty of second degree murder based on implied malice if it found "the killing resulted from an intentional act [and] the natural consequences of the act are dangerous to human life," (CALJIC No. 8.11) followed by the instruction that "a violation of the basic speed law is the commission of an act inherently dangerous to human life." (CALJIC No. 8.95.) Defendant claims these instructions "created an improper conclusive presumption that any violation of California's basic speed law constituted an act 'dangerous to human life.' The instruction[s] violated [defendant's] Fifth and Fourteenth Amendment Due Process rights by removing an element of the offense from the jury's consideration."

The trial court instructed, "The basic speed law of this state is as follows: 'No person shall drive a vehicle at a speed greater than is reasonable or prudent, having due regard for weather, visibility, the traffic on and the surface and width of the highway and in no event at a speed which endangers the safety of persons or property.' [(Veh. Code, § 22350.)] [¶] A violation of the basic speed law is the commission of an act inherently dangerous to human life and safety is a misdemeanor or an infraction. [¶] The rate of speed at which a person travels is considered as an isolated fact in terms of seventy miles per hour is not alone proof of a violation." (CALJIC No. 8.95.)

The prosecution must prove every element of an offense beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 364.) However, an instruction which advises the jury to find that an element of an offense is established upon proof of another fact is unconstitutional because it conflicts with the presumption of innocence and relieves the prosecution of its burden of proving all element of the offense beyond a reasonable

21

doubt. (*Carella v. California* (1989) 491 U.S. 263, 265.)  A conclusive presumption "removes the presumed element from the case once the State has proved the predicate facts giving rise to the presumption." (*Francis v. Franklin* (1985) 471 U.S. 307, 314, fn. 2.)

The issue defendant raises came before the Second District Court of Appeal in *People v. Vanegas* (2004) 115 Cal.App.4th 592 (*Vanegas*).  There, the conviction of a defendant who was found guilty of second degree murder, driving under the influence of alcohol and causing great bodily injury, and driving with 0.08 blood-alcohol level and causing great bodily injury, was reversed.  The court found that the instruction that a violation of the basic speed law is the commission of an act inherently dangerous to human life created an impermissible mandatory presumption which withdrew the element of implied malice from the jury's consideration of the second degree murder charge (*id.* at p. 602) and " 'subvert[ed] the presumption of innocence accorded to accused persons and also invade[d] the truth-finding task assigned solely to juries in criminal cases.' " (*Id.* at p. 599.)

The jury in the instant case was similarly instructed, resulting in the same error which was prejudicial in *Vanegas*.  The question for us is whether the error was prejudicial in our case.

"An instructional error which creates an improper mandatory presumption falls within the category of error subject to *Chapman* review.[5]  Under this standard of review, to find the error harmless we must be able to say beyond a reasonable doubt '[the] unconstitutional presumption did not contribute to the verdict.'  [(*Yates v. Evatt* (1991) 500 U.S. 391, 404.)]" (*Vanegas, supra*, 115 Cal.App.4th at p. 602.)

_____

[5] *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Flood* (1998) 18 Cal.4th 470, 502-503; footnote original, numbering changed.

Unlike the court in *Vanegas*, we are able to say "we are convinced beyond a reasonable doubt the erroneous instruction did not contribute to the verdict because . . . the presumption 'was unimportant in relation to everything else the jury considered' on the issue of dangerousness to human life." (*Vanegas, supra,* 115 Cal.App.4th at p. 602.)

The facts in *Vanegas* were quite different from the facts here. Vanegas drove a pickup truck into an alleyway at the rear of a Los Angeles apartment building where several men were drinking near a utility pole. The decedent, Sifredo Murillo, who appeared to be drunk, was leaning against the pole. Vanegas accelerated as he drove up an incline in the middle of the alley, and one witness moved out of the truck's way. She saw the pickup veer left toward the utility pole and hit Murillo, "pressing" him against the pole. Vanegas reversed the truck, then accelerated again, continuing to press Murillo against the pole. When Vanegas drove out of the alley, he almost struck a police car. Officer Moreno, who was driving the police car, stopped Vanegas for a traffic violation. When Vanegas got out of the truck, Moreno observed signs of intoxication and arrested him.

Meanwhile, Jose Blanco, who had been in the alley with Murillo, ran to the police car and told Moreno about the accident. When Moreno reached the scene, he saw Murillo on his back, not breathing. While Moreno and his partner waited for backup, Vanegas told Moreno he had just "got jumped" by some gang members about half an hour earlier and, indicating Murillo, said " 'that person over there . . . was the one that sent them.' " Moreno said nothing and Vanegas added, " 'I saw him in the alley when I was driving in alley [*sic*]. So I said, "Oh, I'll take care of this right now." ' " Murillo suffered multiple injuries to his pelvis, internal organs, and multiple blood vessels in the pelvic area. He died as a result of blood loss from these injuries. (*Vanegas, supra,* 115 Cal.App.4th at p. 596.)

A breath test administered to Vanegas three hours after the incident showed a blood alcohol level between 0.17 and 0.18 percent. A criminalist estimated that someone

with that blood alcohol level at 12:10 p.m. would have had a blood alcohol level of between 0.21 and 0.26 percent at 9:30 a.m. assuming no further consumption of alcohol. An accident reconstruction expert testified that he believed Vanegas was traveling 15 to 16 miles per hour when he struck Murillo. The prima facie speed limit in the alley was 15 miles per hour. The jury found defendant guilty of the charges as stated above, but did not return a verdict on a manslaughter charge and the count was dismissed. (*Vanegas, supra*, 115 Cal.App.4th at pp. 595-596.)

In considering the evidence the jury accepted in reaching its verdict (*Vanegas, supra*, 115 Cal.App.4th at p. 602), the reviewing court concluded that "the jury most likely focused solely on the fact Vanegas violated the basic speed law." (*Id.* at p. 603.) After analyzing other evidence which the court concluded that the jury had rejected in arriving at its verdicts, the court then concluded that it did not view the evidence of Vanegas' conduct "as so convincing on the issue of dangerousness the unlawful presumption could have had only 'minimal' effect on the jury's verdict." (*Ibid.*) Comparing the relatively innocuous facts in *Vanegas* with the stronger facts in *Watson, supra*, 30 Cal.3d 290, showing a pattern of dangerous and erratic driving, the court concluded that, as summarized by the prosecutor who was seeking a first degree murder conviction, Vanegas " 'was driving northbound up the alley, without hitting any of the telephone poles, without hitting the fence, without hitting any people.' After striking Murillo, 'he straightens out his vehicle to go north and exit the alley. He doesn't hit anyone or anything else, not the truck that's parked right behind the telephone pole, not the people standing near the Jack-in-the-Box area, and not the cars . . . . He makes a decision to not go left because he sees the cars coming. He's not so drunk that he does not know what's going on.' " (*Vanegas, supra*, 115 Cal.App.4th at p. 604.)

The court concluded, "If the much stronger facts in *Watson* were not necessarily sufficient to establish implied malice neither are the facts in the case before us." (*Vanegas, supra*, 115 Cal.App.4th at p. 605.)

In our case, defendant's behavior, briefly, driving while under the influence and speeding in a residential area through a number of stop signs with a driving history that had to have alerted him to the danger of what he was doing, was so egregious that the presumption could only have had a minimal effect on the jury's verdict. The evidence of defendant's culpability is overwhelming, and any error is harmless.

## DISPOSITION

The People having conceded, the conviction for driving under the influence causing injury (Veh. Code, § 23153, subd. (a), count 8) is stricken. In all other respects, the judgment is affirmed.

_____
Premo, Acting P.J.

WE CONCUR:

_____
Elia, J.

_____
Bamattre-Manoukian, J.

25

## ADDENDUM

The following are excerpts from the cross-examination of defendant which he considers improper since the "reason for introducing this evidence was to show defendant had a propensity for drinking and driving."

"[Q.] Mr. Mason, you've left vehicular fatality accidents before and gone home and drank alcohol, haven't you?

"[A.] Yes, I have.

"[Q.] Yes, you have."

"[Q.] And you had been with your friend, Abad Hughes, during the better course or better part of the morning and evening preceding 3:20 in the morning, right?

"[A.] Yes.  The morning and the afternoon, actually. . . .

"[Q.] And in the evening hours, you had come over to Salinas, right?

"[A.] Yes.

"[Q.] With your friend, Abad Hughes?

"[A.] No, I didn't come over to Salinas with him.

"[Q.] Came alone?

"[A.] Yes.

"[Q.] Met up with Mr. Hughes, right?

"[A.] Yes.  I came over to another friend's of our's [*sic*] house.

"[Q.] While you were at the other friend's house, were you consuming alcohol?

"[A.] No.

"[Q.] No.  How about Mr. Hughes, was he consuming alcohol?

"[A.] No.

"[Q.] No alcohol at all?

"[A.] No.

"[Q.] And then you're over at your friend's house. His name was Jimmy, wasn't it?

"[A.] Yes. . . .

"[Q.] You went to another place in the City of Salinas after Jimmy Thornton's residence on March 18th. . . .

"[A.] Yes, yes. . . .

"[Q.] . . . And where was that?

"[A.] TGI Fridays.

"[Q.] TGIF?

"[A.] Uh-huh.

"[Q.] Local pub and bar here in Salinas?

"[A.] Yes. . . .

"[Q.] When you went back there in 2003, that particular establishment, it served hard liquor, didn't it?

"[A.] Yes, it did.

"[Q.] Served alcoholic beverages?

"[A.] Yes, it did.

"[Q.] And you consumed alcoholic beverages, did you not?

"[A.] No, we didn't.

"[Q.] How long were you there?

"[A.] Probably only a couple hours because I played, like, two games of pool and ordered something to eat.

"[Q.] And during that time did you see Mr. Hughes consume any alcohol?

"[A.] No, I didn't. He was talking to Jimmy.

"[Q.] Then where did you go from there?

"[A.] We went back to Jimmy's house. . . .

"[Q.] Okay. And when you went back to Jimmy's house, and now we're into March 18th, 2001, early morning hours, right?

"[A.] I think we got back to his house, . . . say, 11:30, 1:00, something like that because we stayed there and we watched some videos, Dragon Balls. . . .

"[Q.] You left there about what time?

"[A.] Probably a little before 3:00.

"[Q.] . . . And while you were at Jimmy's house and before you left a little before 3:00, you had consumed alcoholic beverages there, hadn't you?

"[A.] Had not.

"[Q.] How about Mr. Hughes?

"[A.] No, I didn't see him consume any either.

"[Q.] You didn't see him consume anything?

"[A.] No.

"[Q.] How about Jimmy?

"[A.] Jimmy always drinks.

"[Q.] He was drinking alone that night?

"[A.] He drinks by himself."

After establishing the collision of the blue Jeep with Hughes's vehicle, the prosecutor focused on defendant's failure to render assistance.

"[Q.] You get out of your car. What kind of car?

"[A.] Dodge. Dodge Stratus.

"[Q.] Is it hard to get out of the car.

"[A.] Yes, it was.

"[Q.] How long did it take you to get out of the car, Mr. Mason?

"[A.] Probably about three minutes or so.

"[Q.] Thirty minutes to get out of the car?

"[A.] No, I said, 'three minutes.'

28

"[Q.] Three minutes, I'm sorry.

"[A.] Yes.

"[Q.] Three minutes. So you get out of the car. What do you do?

"[A.] Well, I climbed out of the ditch and went to the top of the road and I looked around and that's when I noticed that Abad's car was in the ditch some car lengths behind me and the other car was on the other side of the road. . . .

"[Q.] You go back to Abad's car, don't you?

"[A.] Yes.

"[Q.] What do you see when you get back there?

"[A.] He was hanging out of the window.

"[Q.] Was he dead or alive?

"[A.] He looked like he was deceased.

"[Q.] Okay. Did you try to help in any way as far as Mr. Hughes?

"[A.] There was nothing I could do. It was a scene that basically I couldn't do anything. As far as I knew, I couldn't do anything.

"[Q.] You couldn't do anything?

"[A.] Yeah.

"[Q.] So you didn't even approach him, right?

"[A.] I was just standing there on the road.

"[Q.] You didn't even approach him, right?

"[A.] No.

"[Q.] You didn't touch him, right?

"[A.] No.

"[Q.] So you're standing up there on the road for about how long?

"[A.] Probably about twenty minutes.

"[Q.] Twenty minutes?

"[A.] Something like that.

29

"[Q.] Twenty minutes. You stand up and you haven't even gone down to look at Mr. Hughes, right?

"[A.] No.

"[Q.] All right. So you're up there for twenty minutes. What happens next?

"[A.] Some lights came and they stopped and it was a guy there that I actually knew from a friend. I had met him over at his house, and he actually took me to call the police.

"[Q.] His name was Joshua Miller?

"[A.] I didn't know his last name, but I knew his name was Joshua, yes.

"[Q.] You're up there on the side of the road there about twenty minutes and Mr. Miller comes driving by. Is that what you're telling us?

"[A.] Yes.

"[Q.] During this time had you even gone to see what became of the driver of the blue Jeep?

"[A.] It was the same thing. I just looked. I thought he was probably not conscious or something. He was still intact in the Jeep.

"[Q.] I'm sorry, you thought he was unconscious?

"[A.] I thought he might be unconscious, but I really was just kind of in a state of, I don't know, blank. My mind was, like, blank. It was an accident.

"[Q.] Did you ever go over to the blue Jeep to look to see what had become of that particular occupant?

"[A.] I walked toward it, but I was just stuck. I was stunned.

"[Q.] Okay. And at what point during this twenty-minute period would you say you walked over to the blue Jeep?

"[A.] I didn't walk all the way over to it. I just walked to about where I was because the Jeep wasn't far from his car, and I just looked, turned around and looked.

"[Q.] Sir, are you telling us you walked maybe only halfway between Mr. Hughes in the car and the blue Jeep? You walked halfway as far as that distance?

"[A.] I think so.

"[Q.] Could you see any occupants in the blue Jeep from a point halfway between the two vehicles?

"[A.] Not really, because the road was dark.

"[Q.] So you really didn't know what type of injuries or whether or not the driver of the blue Jeep was hurt at all, correct?

"[A.] No, I didn't.

"[Q.] So you're up there about twenty minutes. Do you see any other people stop and try to help the driver of the blue Jeep?

"[A.] No, I didn't see anybody else.

"[Q.] Nobody else was there that stopped and was helping the driver of the blue Jeep?

"[A.] Not that I recall.

"[Q.] When you were standing right there in--you're near Mr. Hughes, right?

"[A.] Yes.

"[Q.] Could you see the blue Jeep from where you were standing by Mr. Hughes' vehicle?

"[A.] Yes. You could see the silhouette.

"[Q.] There is a silhouette?

"[A.] Yes. It was like over to the right-hand side.

"[Q.] While you were standing there, did you see any other cars stop near the Jeep?

"[A.] The only car I ever saw stopping was Joshua's car.

"[Q.] That's it? Okay. So, you saw no other vehicles and Joshua's car. When he stopped, what did you ask of him?

"[A.] Asked him--told him, do you have a cell phone and he told me no. I said, 'I need to call the police. We need to get out of here out [*sic*]. Take me so I can call the police.'

"[Q.] Okay. What did you want to call the police for, to get someone on the phone?

"[A.] Yes, to get them some help.

"[Q.] Why? To get who some help?

"[A.] Everybody involved.

"[Q.] You didn't know the driver of the blue Jeep was injured.

"[A.] Yes, but there was an accident that occurred. I wanted to get the police out there.

"[Q.] Mr. Mason, isn't it true that, while you're there on the scene and before you get into the vehicle of Mr. Miller, you have seen some motorists stop--

"[A.] No.

"[Q.]--with cell phones and call 911 emergency for help? You knew that at that time, didn't you?

"[A.] No, I did not.

"[Q.] You saw no other motorist stop?

"[A.] No, Ma'am.

"[Q.] You're out there for twenty minutes, don't see anybody and you ask Mr. Miller to take you to a phone; is that right?

"[A.] Yes.

"[Q.] Does he do that?

"[A.] Yes, he took me to my house. I gave him directions to my house.

"[Q.] Where was that?

"[A.] Schoonover Park at the time . . . Right off of Reservation. When you come up Blanco Road, you make the left right on Fort Ord and then left at the light, and that's Schoonover.

"[Q.] You had to go to the City of Marina in order to get to your home, right?

"[A.] Yes.

"[Q.] To use a telephone?

"[A.] Yes.

"[Q.] Now, did it cross your mind to go back to the City of Salinas to try to find a telephone since it was closer?

"[A.] The place where we came from, they didn't have a telephone, and I didn't know anyone else in Salinas.

"[Q.] Okay. You knew where the Salinas Police Department was, didn't you?

"[A.] At the time I think, but it was, like, the Salinas Police Department is just like the same length of distance almost.

"[Q.] Is like the what?

"[A.] The length of distance to Jimmy's house because their house is right around the corner across the street from Jimmy's house.

"[Q.] That was what your estimate was, as far as 9/10s of a mile beyond--

"[A.] Actually, probably the police station would be farther than Jimmy's house.

"[Q.] How about South Main Street and any businesses, any twenty-four hour business that might have been open there?

"[A.] As far as twenty-four hour businesses, I don't think I recall any at that time being open.

"[Q.] And as far as Reservation Road, weren't there any twenty-four hour businesses open there that you could have stopped at and used the telephone?

"[A.] Yes, but they were farther than my house."

33

After questioning defendant briefly about going home, calling 911, drinking a "couple sips" of banana rum, and going back to the scene at the dispatcher's request, the prosecutor asked,

"[Q.] Would it be the female officer or Officer Aston that was one of those officers that asked you about the odor of alcohol on your breath at the scene, . . .?

"[A.] That was the female officer. . . .

"[Q.] And she asked you whether you had been drinking, right?

"[A.] Yes.

"[Q.] And what was your response to them [sic]?

"[A.] I told her, yes, I drunk some alcohol at my house.

"[Q.] At your house?

"[A.] Yes.

"[Q.] After this terrible, terrible accident?

"[A.] Yes.

"[Q.] And that was just a couple of sips at that time?

"[A.] Yes. Probably, just, it was a fifth bottle, so I'm just saying a couple sips. I don't recall exactly how much I drunk out of it.

"[Q.] Back there on the road, Blanco Road, Mr. Mason, you told Joshua Miller to get you out of there because you had been drinking and driving; isn't that right?

"[A.] No, I did not tell him that.

"[Q.] You wanted to get out of there because you had been drinking and driving; isn't that right?

"[A.] No, that is not correct.

"[Q.] You wanted to get out of there to get help, is that what you're telling us, because there had been no other motorists there that had stopped, but Mr. Miller; is that right?

"[A.] That's the only motorist I remember seeing stop."

34

## CONCLUSION

Petitioner, Shavougue Mason, respectfully requests this Court grant his
petition for review to address the important issues of state-wide importance
which are raised in this case.

DATED: March 13, 2007.

Respectfully submitted,

Irma Castillo
**Attorney for Petitioner**
**Shavougue Antoine Mason**

## CERTIFICATE OF COMPLIANCE WITH RULE 8.520(c)(1)

I, Irma Castillo, counsel for Shavougue Antoine Mason, certify pursuant to the California Rules of Court, rule 8.520(c)(1) the word count for this document is 10,608 words, excluding the tables, this certificate, and the caption on page one. This document was prepared in WordPerfect 8 and this is the word count generated by the program for this document.

Executed March 13, 2007 at Berkeley, California.

Irma Castillo

Filed 9/7/06  P. v. Mason CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SHAVOUGUE ANTOINE MASON,<br><br>    Defendant and Appellant. | H028624<br>(Monterey County<br> Super. Ct. No. SS033582) |

Defendant Shavougue Antoine Mason was sentenced to 45 years to life in state prison. He was convicted of killing Rene Porras, Rosalinda Gonzales, and the couple's unborn child, when he drove at excessive speed through a stop sign under the influence of alcohol on December 4, 2003. On appeal, he challenges the sufficiency of the evidence of mental state, the admissibility of his driving history of Vehicle Code violations and accidents, and a jury instruction which created "an impermissible conclusive presumption in violation of [defendant's] right to due process of law."

### FACTS

Around noon on December 4, 2003, City of Salinas employees Jose Zepeda and Raul Zagal were parked at the curb of Park Street between Villa and Homestead Streets, when they heard a vehicle approaching them eastbound on Park Street. A green car passed them at a speed both estimated to be over 60 miles per hour. Zepeda got a good look at the driver and later identified him as defendant.

Park Street runs east-west and has stop signs at each intersection which permit north-south traffic to flow unimpeded. The neighborhood is a high-density residential area with a 25 mile per hour speed limit. Zepeda watched the green car accelerate to about 75 miles per hour though the intersection of Park and Homestead Streets without attempting to stop at the stop sign. The vehicle had reached about 80 miles per hour when it entered the next intersection at West Street, again making no attempt to stop at the stop sign. Zepeda lost sight of the green car between West Street and the third intersection at Riker Street.

Bruce Laine was driving on West Street approaching the Park Street intersection when he saw a vehicle traveling more than 60 miles per hour "fl[y] through the stop signs at Park and West Street" and collide with a BMW traveling about 20 miles per hour southbound on Riker Street. Rene Porras was the driver of the BMW; eight-months pregnant Rosalinda Gonzales was the front seat passenger, and three-year-old Rene Porras, Jr., and five-year-old Joshua Perez were in the backseat.

Defendant's car, a Volkswagen Passat, which had been traveling eastbound on Park Street, came to rest in the middle of the intersection with Riker Street facing westbound. The BMW came to rest against a residence. A third vehicle was struck by the BMW as it careered toward the residence; it sustained only minor damage.

Defendant's airbag deployed. He stayed inside his car for 10 to 20 seconds, then slowly emerged looking both "very weary" and "very stunned." He walked to the BMW, leaned over and looked briefly into the car through the passenger side window, and then either walked rapidly or ran away from the scene. He went to the apartment he shared with his girlfriend, Misty Flores, about 1/10th of a mile from the scene, and had her call 911. Police took him into custody shortly thereafter. Police found a three-quarter full bottle of Bacardi Silver Raz, a raspberry-flavored rum drink with the alcohol content of beer, on the kitchen counter. An empty 750 mm bottle of Hennessey cognac was found in the VW's trunk compartment.

2

When police officers took defendant into custody, he smelled moderately of alcohol and had "somewhat glassy and red" eyes. He was given field sobriety tests at the police department at 1:15 p.m., causing an officer to conclude he was under the influence of alcohol. Defendant's blood alcohol level at that time, measured with a hand-held breath screening device, was 0.13. A blood sample drawn at 1:50 p.m. yielded a blood alcohol level of 0.19 percent. At trial, a criminalist testified that the hand-held screening device does not necessarily accurately measure alcohol that might be in a person's system, depending on whether the subject has blown long enough or hard enough to get to the deepest air in the lungs. The criminalist testified that based on the two test results, defendant's blood alcohol level at noon, just before the accident, was 0.23.

Porras died as a result of major head injuries. Gonzales, who could not be taken from the car until part of it had been cut away, died from a broken neck exacerbated by significant blood loss from a ruptured uterus. The fully-developed female fetus being carried by Gonzales died from asphyxiation brought on by the terminal injuries to Gonzales. Rene Porras, Jr., suffered a fractured tibia and Joshua Perez escaped with bruises and scrapes.

Conclusions based on a reconstruction of the accident were: (1) defendant's vehicle had no mechanical problems that would have contributed to the accident; (2) defendant's speed at impact was 46.28 miles per hour and the speed of the BMW was 20.16; and (3) defendant's car had not stopped at the stop sign at the site of the collision, Riker and Park Streets. An expert testified that "impact speed" is not the speed at impact; it is the speed "where the crushing stops." Defendant's speed prior to impact would have been greater than 46.28 miles per hour.

Defendant stood trial on a nine-count information alleging three counts of murder (Pen. Code, § 187, counts 1-3);[1] two counts of gross vehicular manslaughter while

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

3

intoxicated (§ 191.5, subd. (a), counts 4-5) and two counts of vehicular manslaughter with gross negligence (§ 192, subd. (c)(1), counts 6-7) with the allegations that defendant fled the scene after committing the offenses alleged in counts 4, 5, 6, and 7 (Veh. Code, § 20001, subd. (c)); driving under the influence of alcohol causing injury (*id.*, § 23153, subd. (a), count 8); and driving with a blood alcohol level of 0.08 and above (*id.*, at subd. (b), count 9). Counts 8 and 9 also carried the allegations that defendant personally inflicted great bodily injury on Rene Porras and Rosalinda Gonzales in their commission (§ 12022.7, subd. (a)), and that he personally inflicted great bodily injury upon Rene Porras, Jr., a child under the age of five years (*id.*, at subd. (d)).

At the jury trial, defendant testified that he was working as a night auditor/manager at the Monterey Beach Resort in December 2003, and that he had been working overtime eight-hour night and day shifts that month. On December 4, he woke up early after a few hours sleep and took the child of a family friend to school. He then went to a friend's house, stayed there for a while, and then gave his friend a ride somewhere, after which he decided to go home and lie down because he was tired. It was about 11:45 a.m. Driving at about 25 miles per hour, he turned onto Park Street from Villa Street, did a "bump stop" at Homestead and Park Streets, dozed off as he passed Homestead, and awoke just before the collision. He slammed on his brakes, but crashed into the BMW's passenger door.

Defendant's air bag deployed. He did not become unconscious, but sat in his car stunned, and then climbed out and went to the other car. Everybody was unconscious except the two children who were crying. He had to "actually ask the kids to calm down because I couldn't get them out of the car. . . . I told them to wait until the police came." Defendant explained he did not try to get the children out of the car before the police or an ambulance came "[b]ecause I have medical training and you're not supposed to touch people until medical people get there." There was a lady standing in the yard and defendant asked her to call 911. She was speaking Spanish. Defendant stated he was

hysterical. He did not see anyone else around although Zepeda and others who observed him driving were coming to the scene. When the lady "didn't respond, I just basically panicked and I said I was going to my house to call the police." He ran home and told his girlfriend, "I need to call 911. Call 911."

Defendant denied having anything to drink before the collision but drank only after it. After he told Flores to call the police, he got a half-full pint bottle of Hennessey cognac out of a cabinet and "just turned it up and drunk [*sic*] it" all. He also took some sips from a Bacardi Silver as well, but that was while he was on the phone with the dispatcher. While he was still on the phone with the dispatcher, there was a knock on the door. Police were waiting for him downstairs. He left the apartment to meet them and was immediately handcuffed. After he had been outside for a while, he began to feel the effects of the alcohol he had drunk at home.

Defendant admitted going "a few" miles per hour over the speed limit, but he did not believe he was going between 60 and 80 miles per hour. He acknowledged that going at a high speed through an intersection was "possibly" dangerous to others, that unsafe speed could kill, and that driving under the influence was dangerous. He described himself as hysterical and panicked after the collision and said he drank the brandy to calm his nerves.

Flores corroborated she called 911 for defendant and provided him with alcohol. She said defendant told her he did not know if anyone had been hurt in the accident. Flores's son testified about putting a liquor container in a dumpster. Officer John Lynn testified Flores told him defendant drank a 12-ounce bottle of Bacardi Silver plus a few sips from a second bottle. The first went into the dumpster and the second was taken by police. Flores stated there had been no bottles of Hennessey in the apartment.

On February 7, 2005, the jury found defendant guilty of all counts and found true all allegations except great bodily injury on Rene Porras, Jr. This appeal ensued.

## ISSUES ON APPEAL

Defendant contends: (1) the murder convictions must be reversed because the evidence was insufficient to establish the mental element of second-degree murder, implied malice; (2) the trial was fundamentally unfair and violated defendant's right to due process because in admitting his driving history, the trial court admitted prejudicial evidence of other bad acts which was irrelevant to the issue of the subjective knowledge element of implied malice murder; (3) the murder convictions must be reversed because the trial court violated defendant's right to due process of law by instructing the jury that any violation of California's basic speed law constituted an act dangerous to human life which created an impermissible conclusive presumption; and (4) the driving under the influence causing injury conviction must be reversed because it is a lesser included offense to the conviction for vehicular manslaughter while intoxicated with gross negligence. The People concede that count 8, a lesser included offense of vehicular manslaughter while intoxicated with gross negligence, must be stricken in light of *People v. Miranda* (1994) 21 Cal.App.4th 1464, 1467-1469. We will so order.

## SUFFICIENCY OF THE EVIDENCE OF IMPLIED MALICE

Defendant contends the evidence was insufficient to establish implied malice because the evidence presented by the prosecution, namely, past convictions of traffic violations, an alcohol-related reckless driving, an automobile accident in which he had been at fault, and an accident on Blanco Road in which he was not at fault but in which his friend, driving behind him in his own vehicle, was killed, "fell far short of proving [defendant] 'subjectively knew his driving created a substantial risk to human life and consciously disregarded that danger.' "

The Blanco Road evidence came from the California Highway Patrol officer who investigated it and defendant's testimony. The officer arrived on the scene in the early morning hours of March 18, 2001, and saw a heavily damaged blue Jeep with an unconscious driver blocking Blanco Road. A heavily damaged red car contained the

remains of its driver, defendant's friend Abad Hughes, who was killed in the accident. Hughes's body was "hanging out of the driver's side from his waist where the window starts and then his head was smashed into the ground" with "brain matter [splattered] across the road." Defendant's car, a gray Dodge Stratus, was in a ditch off the shoulder further along Blanco Road, and had also been involved in the accident. Defendant stated he had been driving ahead of Hughes when he saw the Jeep approaching him on the wrong side of the road, and he swerved to the right to avoid it, but could not. The Jeep hit defendant's car and knocked it off the road. The Jeep continued in the wrong lane of traffic and crashed into Hughes's car.

On cross-examination of defendant, the trial court allowed the prosecutor to elicit evidence that when a car came upon the scene, defendant had the driver, whom he knew slightly, take him home to call the police. While he was there, he had "a couple sips" of banana rum. The dispatcher asked him to return to the scene. Once there, defendant talked to an officer who asked him about the alcohol she smelled on his breath. He explained that while he was home, he had "a couple sips" from "a fifth bottle."

The prosecutor also presented evidence that on October 6, 1999, defendant was responsible for an accident which occurred when motorist John Jones was slowing to make a left-hand turn on Main Street in Salinas. Defendant's car struck the right rear portion of Jones's vehicle causing between $2300 and $2400 worth of damage. Defendant's car kept going around a corner and stopped. Jones followed and saw that defendant's car had sustained equal or possibly greater damage than his.

The alcohol-related reckless driving occurred on March 26, 1993. Marina Department of Public Safety Officer James Clagg observed the left-hand turn signal of defendant's vehicle blinking while he was in "a straight-only lane." That street had a left-turn lane, so Clagg thought defendant was going to turn left from an improper position. However, defendant stopped at the green light and sat there with his turn signal blinking through the next traffic light cycle. Cars went around defendant to proceed

through. When the light turned green the second time, defendant turned off his signal and went straight through the light. Clagg stopped defendant and detected a moderate to strong odor of alcohol on his breath, slow but not slurred speech, and red and watery eyes. When defendant got out, he had to hold on to the side of the door and the door frame. When he walked, he was "kind of straggling." Defendant failed the field sobriety tests. Defendant ultimately was convicted of an alcohol-related ("wet") reckless driving. (Veh. Code, § 23103.5.)

Defendant's additional driving record consisted of the following convictions: six for speeding on November 29 and December 11, 1995; October 31, 1996; May 1 and August 7, 1997; and February 9, 2001; one for disobeying a traffic signal on February 13, 1996; and one for failure to yield to a pedestrian in an intersection on April 16, 2001.

In reviewing the sufficiency of the evidence, the appellate court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence--that is, evidence which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "[U]nder the usual standard of the substantial evidence rule, [the reviewing court] resolv[es] all conflicts in evidence and questions of credibility in favor of the verdict, and indulg[es] every reasonable inference the jury could draw from the evidence." (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.)

Implied malice second degree murder is committed "when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " . . . .' [Citations.] Phrased in a different way, malice may be implied when [a] defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson*).) "[W]hen the

8

conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied." (*Id.* at p. 298.) "Implied malice requires proof the accused acted deliberately with conscious disregard for life" (*People v. Contreras* (1994) 26 Cal.App.4th 944, 954 (*Contreras*)) based on a "determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*Watson, supra,* 30 Cal.3d at pp. 296-297.)

Defendant cites *Contreras, supra,* 26 Cal.App.4th at page 948 among other cases to "illustrate[] why the prosecution's evidence cannot support the implied malice finding needed for a murder conviction in this case. In *Contreras* the prosecution established not only that Contreras had been cited for numerous violations of the Vehicle Code, it also established what conduct constituted those violations. (See, e.g., *id.* at pp. 949-950 [58 mph in 35 mph zone; 85-90 mph on the freeway and driving recklessly; speeding, unsafe lane changes and tailgating in a residential area; almost causing 'several traffic accidents'[;] almost causing accident and reckless driving arrest while driving 90-100 miles per hour and weaving through traffic[;] and police officer's admonishment that Contreras's reckless driving could lead to a traffic fatality].) The evidence also established Contreras had been racing with other tow trucks when the deadly accident occurred. On this evidence the appellate court concluded, 'Based on his driving record, his prior accident, and the known inadequacy of his brakes on the date in question, the issue was not whether Contreras would have a serious traffic accident, but when.' (*Id.* at p. 956.) Thus the appellate court had no difficulty finding the evidence sufficient to show Contreras 'subjectively knew his driving created a substantial risk to human life and consciously disregarded that danger.' (*Id.* at p. 957, citations omitted.)"

Defendant finds his own driving "[i]n striking contrast." As he describes it, his driving consisted of "driving over the legal limit through a residential area and . . . not stop[ping] at three posted stop signs. There was no evidence of any erratic or evasive driving on his part, no near misses with other cars or pedestrians in the street. Although

9

witnesses estimated his speed as high as 80 miles per hour, his speed at impact was 46.2 m[iles per hour], allowing a reasonable inference that as [defendant] neared the intersection of Park and Riker Streets he had already reduced his speed, further reducing it when he braked as he became aware of the BMW in the intersection, or that he had not been traveling as fast as witnesses had speculated.

"Further, [defendant's] convictions related to speeding, failure to yield to a pedestrian in a crosswalk, and failure to obey a traffic sign[,] only demonstrated [defendant] had committed these Vehicle Code violations. It [sic] did not establish . . . [defendant's] speed leading to the citation, whether he had caused any accidents with other people or property, or even if he had nearly missed hitting people or property. While his conviction for alcohol-related reckless driving stemmed from his conduct while driving, that conduct did not consist of speeding, driving erratically, or almost causing an accident.

"Although [defendant] had been involved in two accidents, he had not been at fault in the accident that claimed his friend's life [the Blanco Road incident]. The other accident [with John Jones] involved a non-fatality accident and again, [defendant] had not been cited for speeding or reckless driving as a cause of the accident, nor of drinking and driving. Finally, there was no evidence [defendant] attended any driver education program demonstrating the dangers inherent when drinking and driving."

Substantial evidence--of defendant's conduct on the day in question, of defendant's admissions, and of his history of dangerous driving--supports the jury's finding that defendant "*actually appreciated* the risk [of danger to the lives of others] involved" (*Watson, supra*, 30 Cal.3d at p. 297) in drinking and driving, speeding (60-80 mph in a 25 mph zone), and running stop signs.

Expert testimony placed defendant's blood alcohol level at 0.23 at noon, just before the collision. Defendant admitted under cross-examination that he was driving "a few miles" over the speed limit; he did not come to a complete stop at the Homestead

intersection; and he dozed off just before the collision. He also stated he knew it was dangerous to the lives of others to drive while under the influence, that he knew there was possible danger to others when one drives at a high speed through an intersection, and that he knew driving at an unsafe speed could kill. Defendant's conduct immediately after the accident (looking into the BMW and seeing unconscious adults and crying children, doing nothing to help them, running home, and drinking a substantial amount of alcohol before and while talking to the dispatcher) supported the inference of a consciousness of guilt that his dangerous driving while intoxicated resulted in harm to the victims. Furthermore, defendant's consuming alcohol immediately after the accident and telling the 911 operator that he had just started drinking reasonably supports the inference he consciously attempted to mislead the investigators and make irrelevant the results of the blood alcohol test. Finally, in light of the true finding of the allegation that he fled from the scene, evidence of flight supports an inference of consciousness of guilt. (§ 1127c.)

Defendant's driving history entitled the jury to infer that regardless of the circumstances surrounding a prior instance of reckless driving, "the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and understanding of the personal and social consequences of such behavior." (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 115 (*Ortiz*).) In this case, defendant's driving history and his subsequent failure to conform his conduct to statutory norms is evidence supporting an inference of malice because it reflects actions done with a subjective awareness of danger greater than that of other drivers, and a willingness to commit the acts anyway. (*Id.* at pp. 115-116.) Even the Blanco Road accident for which defendant was not charged and in which his friend was killed supports an inference by a rational jury that the totality of defendant's past experiences gave him the knowledge to appreciate the risk to human life of a driver's failure to conform his conduct to the rules

11

governing the operation of a vehicle, despite which defendant acted deliberately with conscious disregard for life. (*Watson, supra*, 30 Cal.3d at p. 296.)

## DEFENDANT'S DRIVING RECORD--OTHER "BAD ACTS"

Next, defendant complains his trial was fundamentally unfair and violated his right to due process, because the evidence of his driving history to prove implied malice admitted under Evidence Code section 1101, subdivision (b),[2] and his conduct after the Blanco Road accident on the issue of credibility and for impeachment (§ 1101, subd. (c)) was irrelevant and prejudicial. The trial court admitted the Blanco Road evidence (with the exclusion on direct examination of defendant's post-accident use of alcohol) over defendant's objection because it demonstrated defendant's "first-hand lesson in the danger of unsafe driving and the consequences to human life," even though defendant did not cause the accident.

Defendant complains "[t]here is no lesson to be learned 'first hand' when one's own conduct does not cause the accident." "Since the Blanco Road evidence did not show [*defendant*'s] driving 'sensitize[d]' him 'to the dangerousness of such life-threatening conduct,' the evidence should have been excluded." (Italics defendant's.) He adds, "[t]he sum of the evidence only branded [defendant] as a miscreant. Further, even if the evidence of [defendant's] post-accident drinking after the Blanco Road accident was admissible under section 1101, subdivision (c), the evidence was inadmissible under Evidence Code section 352 because it uniquely served to evoke an emotional bias against

---

[2] Further statutory references in this section are to the Evidence Code. Section 1101, subdivision (b), provides: "Nothing in this section [(1101)] prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act." Subdivision (c) provides: "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

[defendant] and had little effect on the issues. These errors were exacerbated because the jury was not given an appropriate limiting instruction at the end of trial."

"It has long been the rule, of course, that evidence of uncharged misconduct is inadmissible to establish a defendant's *propensity* to commit the offense charged. The bar on the use of such 'propensity evidence' is not that it lacks relevance. Rather, it is the concern that such evidence may be regarded by the trier of fact as *too* relevant, 'provoking,' as Wigmore has it, 'an overstrong tendency to believe defendant guilty' based on the commission of the *prior* acts rather than those charged in the pending prosecution. In short, the evidence is barred to prevent conviction based upon the defendant's 'bad character.' [Citations.] California's Evidence Code codifies this bar in section 1101, subdivision (a) (section 1101(a)). That provision makes flatly inadmissible 'evidence of a person's character or a trait of his . . . character . . . when offered to prove . . . conduct on a specified occasion.' [Citations.]" (*Ortiz, supra,* 109 Cal.App.4th at p. 111.)

*Ortiz* continues, "The *exceptions* to the bar on the admissibility of such evidence of uncharged acts are equally well established. Codified as subdivision (b) of section 1101 (section 1101(b)), the rule has long been that evidence of uncharged misconduct *is* admissible where relevant to prove 'some fact (such as motive, opportunity, intent, preparation, plan, *knowledge*, identity, absence of mistake or accident . . .) other than [a defendant's] disposition to commit such an act.' [Citation, italics added by *Ortiz*.] We emphasize the word 'knowledge' in the foregoing statutory enumeration because, in seeking admission of the uncharged misconduct evidence at defendant's trial, it was the prosecution's contention that the evidence was relevant because it tended to establish a subjective awareness on the part of defendant of the disastrous consequences that can follow in the wake of recklessly operating a motor vehicle on a public highway. As tending to establish, in other words, defendant's *knowledge*--gained in the course of the prior misconduct--of the natural consequences, dangerous to life, of the reckless

operation of a motor vehicle, and of his persistence in that behavior, thus evidencing a conscious disregard for the lives of others on the road. These mental features, of course, comprise the mens rea of implied malice, thereby supporting an accusation of second degree murder." (*Ortiz, supra,* 109 Cal.App.4th at pp. 111-112.)

To be admitted under section 1101, evidence of uncharged crimes must be material; it must have a tendency to prove or disprove the material fact; and it must not meet the criteria of any rule or policy requiring exclusion of relevant evidence, e.g., Evidence Code section 352. (*People v. Sully* (1991) 53 Cal.3d 1195, 1224.) " ' "Since 'substantial prejudicial effect [is] inherent in [such] evidence,' the uncharged offenses are admissible only if they have substantive probative value. [Citation.]" ' [Citation.]" (*Ortiz, supra,* 109 Cal.App.4th at p. 116.)

"Critical to this second inquiry is the relaxed standard under which an appellate court reviews evidentiary determinations by the trial court--the familiar 'abuse of discretion' standard. [Citations.] What Witkin terms the 'classic statement' of the contours of the trial court's discretionary power appears in the early case of *Bailey v. Taaffe* (1866) 29 Cal. 422, 424, where the court wrote that the ' "discretion intended . . . is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia*, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." ' [Citation.]" (*Ortiz, supra,* 109 Cal.App.4th at p. 117.)

Defendant complains here that the Vehicle Code violations comprising his driving history did not prove a material fact, that is, the subjective knowledge component of implied malice. The prosecutor's "bare bones" evidence of defendant's convictions for traffic infractions or accidents were intended, as she said, to "demonstrate[] he 'could only become aware that there were reasons for the prohibition against this type of anti-social conduct and the type of driving that ultimately endangers other community

14

members and is therefore prohibited.' " Defendant claims this history "only demonstrated he had not 'ultimately endanger[ed] other community members . . .' [Citation.] [¶] . . . It simply demonstrated conduct which almost any driver has engaged in at some given point--consciously or not--while driving, such as driving through a stop sign, failing to yield to a pedestrian, or the hazards of tailgating."

Whether defendant's official driving record is similar to that of "almost any driver," the facts presented by the prosecutor--that defendant was caught in violations involving the safe operation of a motor vehicle on 10 occasions, plus a "wet" reckless driving and a collision with John Jones--that he was brought before the court and convicted of each offense and required to pay a penalty--is evidence from which the jury could infer that past experience had warned him that speeding, failing to yield to a pedestrian, failing to stop at a stop sign, and driving under the influence of alcohol, created a substantial risk to human life.

"Psychologically speaking, the insights of the courts in these cases [where other evidence shows a wanton disregard for life and the facts demonstrate a subjective awareness of the risk created] seem little more than commonplace, intuitively familiar to most. A jury is entitled to infer that regardless of the mental state or condition that accompanies an instance of reckless driving--whether intoxication, rage, or willful irresponsibility--the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and understanding of the personal and social consequences of such behavior. The lesson in these many cases was not lost on the trial court . . . . [As the trial judge stated from the bench,] '[e]very time the defendant drove badly before he allegedly committed these two murders,' . . . 'and every time he was convicted or arrested or punished in some fashion, *his awareness of the dangers of driving badly increased* and that is what the district attorney has a legitimate right to try to prove . . . [did] this defendant have implied malice in his mind or not when he drove the way he did, and that is a subjective standard. So we have to find out what he was exposed to that

15

most people aren't exposed to in order to understand his level of awareness of the dangers of driving badly.' (Italics added [by *Ortiz*].)" (*Ortiz, supra*, 109 Cal.App.4th at pp. 115-116.)

Our jury, also, could reasonably infer that on this occasion as defendant sped through several stop signs after having been drinking, he was aware of the risk to safety of which he had been warned on more than 10 occasions and which he was then consciously disregarding. This evidence formed a basis from which the jury could evaluate whether defendant's knowledge as informed by past events when applied to the facts of the instant case demonstrated the implied malice necessary to find second-degree murder.

Next, defendant complains that the prosecutor used her Blanco Road cross-examination (for excerpts, see Addendum, *post*) to elicit details that were irrelevant since defendant admitted that he had had something to drink after that accident. The prosecutor used this evidence "to unfairly malign [defendant] in the eyes of the jury. [His] denials could not erase the implications, voiced loudly in the prosecutor's summation, that [defendant] was nothing better than a liar, a man who drinks and drives, causes accidents and death, and thinks only of how he can evade responsibility for his actions. In other words, a person of bad character and propensity to commit these type[s] [of] crimes." This evidence caused an undue consumption of time and should have been excluded as " ' "uniquely tend[ing] to evoke an emotional bias against . . . [one party] as an individual and which has very little effect on the issues." ' " (*People v. Garceau* (1993) 6 Cal.4th 140, 178.)

First, defendant's driving conduct on Blanco Road was not admitted under section 1101(b), as uncharged bad acts evidence. Defendant was not accused of culpability in that incident, and there was no evidence that he drove in a manner that was unsafe. However, the incident, in all its tragic detail, was relevant to defendant's state of mind. On Blanco Road, defendant experienced the results of someone else's unlawful drinking

16

and driving which put him in immediate danger and from which he narrowly escaped; which caused the death of his friend whose body was "hanging out of the driver's side from his waist where the window starts and then his head was smashed into the ground" with "brain matter [splattered] across the road"; and which injured the culpable driver who was pinned in his vehicle, unconscious. The experience was relevant on the issue of defendant's knowledge and subjective awareness that unlawful operation of a vehicle could result in death to other persons. The fact that the person killed was a friend supported the further inference that the death would have a heightened impact on defendant's subjective awareness.

Furthermore, under Evidence Code section 1101, subdivision (c), the Blanco Road evidence was also offered for the "far narrower purpose of showing the implausibility and untruthfulness of defendant's testimony in the [instant] case. [Citation.] [¶] . . . The jury could readily find that defendant's credibility in the present case was diminished by the fact that he offered the same explanation for [alcohol on his breath in the Blanco Road accident]." (*People v. Millwee* (1998) 18 Cal.4th 96, 131 (*Millwee*).)

As in *Millwee*, "[t]he trial court could properly conclude that the [Blanco Road testimony] was highly probative on the limited credibility issue for which it was offered, that defendant's credibility was a crucial issue at trial, and that the potential for undue prejudice was slight under the circumstances." (*Millwee, supra*, 18 Cal.4th at p. 131.)

In connection with the Blanco Road evidence, defendant contends that the trial court should have instructed the jury with CALJIC No. 2.50, and that his trial counsel rendered ineffective assistance in failing to request the instruction. CALJIC No. 2.50, Evidence of Other Crimes, deals with the jury's use of evidence of crimes "other than that for which [the defendant] is on trial." This instruction was given before the prosecution presented evidence of defendant's traffic violations. At that time, the court instructed, "evidence is going to be introduced for the purpose of showing that the Defendant committed infractions. It is not used for any purpose other than that, for

17

which he is on trial, this evidence, if believed, may not be considered by you to prove that the Defendant is a person of bad character or that he has a disposition to commit crimes. [¶] It may be considered by you only for the limited purpose as determining if it tends to show the existence or the intent or mental state which is a necessary element of the crime of murder as charged in counts one, two and three. [¶] For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as all the other evidence in the case. You are not permitted to consider this evidence for any other purpose." The instruction, or a modified version of it to fit the Blanco Road evidence, was not given in connection with the Blanco Road evidence, nor did defendant request it.

Nevertheless, defendant argues his trial was unfair because the jury should have been admonished that the evidence was inadmissible to show that he was a person of bad character or that he had a disposition to commit crimes, which was precisely what he contends the prosecutor requested an admonition in closing argument.[3] Defendant asserts defense counsel was ineffective in failing to request a limiting instruction. In his closing argument, defense counsel stated, "[a]nd the prosecution tries to paint him into a corner using that, not to show that there is particular knowledge, just to kind of paint this with a broad brush, well, here's another situation where he drove, drank and drove. You can't

---

[3] The prosecutor stated that the Blanco Road evidence showed that the defendant "has been in a similar situation, has been in an accident in which law enforcement were [*sic*] going to be there, were [*sic*] going to come out and has left the scene. And when returning to have contact with law enforcement, . . . [h]e needed an explanation as to what would be the odor of alcohol on his breath, what would be physical symptoms of being under the influence."

"The defendant got the heck out of there a lot sooner than what he claims to be a twenty-minute wait when no one was around. He got out of there a lot sooner than that. [¶] And I submit to you, Ladies and Gentlemen, as evidence of what is a very selfish and cowardly man, a selfish and cowardly man who does not care about the safety of others, who cares about one person only, and that's himself, who leaves people in a car hurt and dying, doesn't care about anybody but himself. And he intentionally commits acts that are dangerous to other people because he doesn't care about anyone but himself. He disregards that danger to other people, disregards it."

do that. That's not right. That's not fair. That's not a situation where you can draw those kinds of implications here." Defendant observes, "[r]ather than argue about the relevance of this evidence, counsel should have asked for the standard instruction limiting the consideration of evidence of other bad acts."

The People state that CALJIC No. 2.50 "simply does not apply." The People say CALJIC No. 2.50 would have been error if given because it would have told the jury that defendant's conduct at Blanco Road was criminal even though the authorities did not treat it as such. Furthermore, "[t]he rebuttal . . . evidence was in direct response to [defendant's] mischaracterization of his conduct at 'Blanco Road.'[4] Further, the rebuttal evidence was, again, not bad-act evidence[.] [I]t was evidence not amounting to criminal misconduct but clearly relevant to [defendant's] subjective knowledge of the gravity of his acts. [Citation.] [¶] As such, neither an admonition nor CALJIC No. 2.50 was required."

The post-collision evidence was "evidence offered to . . . attack the credibility of a witness" (Evid. Code, § 1101, subd. (c)), and was offered for that limited purpose. An instruction à la *Millwee* would have been advisable. In *Millwee*, the trial court instructed that "such evidence had no bearing on defendant's character or disposition" (*Millwee*, *supra*, 18 Cal.4th at p. 131) but was admitted for the purpose of showing knowledge that defendant's driving posed a substantial risk to human life and that he proceeded with a conscious disregard of the danger, and on the issue of the plausibility and truthfulness of defendant's testimony. (See *ibid.*) As it was, defendant's prosecutor made a passionate appeal to the jury to find that defendant was a "selfish and cowardly man" who acted in accordance with this propensity and committed the instant crimes. The jury received no

---

[4] The People do not provide a citation to the record for the purported "mischaracterization." It is unclear what respondent was referring to. Possibly the People were taking issue with defendant's adamant and uncontradicted insistence that he had nothing alcoholic to drink before the Blanco Road accident.

guidance from the court on the proper uses of this evidence. This was error. In order to warrant a reversal, however, defendant must show prejudice. For that question, we turn to defendant's claim of incompetence of counsel.

Defendant asserts counsel's performance was deficient for failing to request the instruction. To prevail on a claim of ineffective assistance, a defendant must show not only (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, but also (2) that, as a result, the defendant was prejudiced, i.e., there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland*).)

In this case, defendant has not shown that he was prejudiced, that is, that there is a reasonable probability that, absent the alleged errors, the jury would have entertained a reasonable doubt respecting the defendant's guilt. (*Strickland, supra*, 466 U.S. at p. 695.) The evidence of the circumstances of the crime was overwhelming. Disinterested witnesses either observed defendant's preaccident speeding and red-light running or observed the collision itself. They also observed defendant's conduct after the accident when he left the scene. There was substantial evidence of defendant's inebriation at the time of the accident. Using breath and blood readings taken after the accident, the criminalist was able to extrapolate defendant's blood alcohol level just before the accident. At 0.23, defendant's blood alcohol level was well beyond the 0.08 level at which a driver is guilty of violating Vehicle Code section 23153, subdivision (b), driving with a blood alcohol of 0.08 or above. Evidence of implied malice was well established

20

as stated *ante*. In light of the totality of the evidence, it is not reasonably likely that the outcome would have been more favorable to defendant in the absence of the error.

## INSTRUCTION CREATING
## "AN UNCONSTITUTIONAL CONCLUSIVE PRESUMPTION"

Next, defendant asserts that the trial court violated his right to due process when the trial court instructed that the jury could find him guilty of second degree murder based on implied malice if it found "the killing resulted from an intentional act [and] the natural consequences of the act are dangerous to human life," (CALJIC No. 8.11) followed by the instruction that "a violation of the basic speed law is the commission of an act inherently dangerous to human life." (CALJIC No. 8.95.) Defendant claims these instructions "created an improper conclusive presumption that any violation of California's basic speed law constituted an act 'dangerous to human life.' The instruction[s] violated [defendant's] Fifth and Fourteenth Amendment Due Process rights by removing an element of the offense from the jury's consideration."

The trial court instructed, "The basic speed law of this state is as follows: 'No person shall drive a vehicle at a speed greater than is reasonable or prudent, having due regard for weather, visibility, the traffic on and the surface and width of the highway and in no event at a speed which endangers the safety of persons or property.' [(Veh. Code, § 22350.)] [¶] A violation of the basic speed law is the commission of an act inherently dangerous to human life and safety is a misdemeanor or an infraction. [¶] The rate of speed at which a person travels is considered as an isolated fact in terms of seventy miles per hour is not alone proof of a violation." (CALJIC No. 8.95.)

The prosecution must prove every element of an offense beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 364.) However, an instruction which advises the jury to find that an element of an offense is established upon proof of another fact is unconstitutional because it conflicts with the presumption of innocence and relieves the prosecution of its burden of proving all element of the offense beyond a reasonable

doubt. (*Carella v. California* (1989) 491 U.S. 263, 265.)  A conclusive presumption "removes the presumed element from the case once the State has proved the predicate facts giving rise to the presumption." (*Francis v. Franklin* (1985) 471 U.S. 307, 314, fn. 2.)

The issue defendant raises came before the Second District Court of Appeal in *People v. Vanegas* (2004) 115 Cal.App.4th 592 (*Vanegas*).  There, the conviction of a defendant who was found guilty of second degree murder, driving under the influence of alcohol and causing great bodily injury, and driving with 0.08 blood-alcohol level and causing great bodily injury, was reversed.  The court found that the instruction that a violation of the basic speed law is the commission of an act inherently dangerous to human life created an impermissible mandatory presumption which withdrew the element of implied malice from the jury's consideration of the second degree murder charge (*id.* at p. 602) and " 'subvert[ed] the presumption of innocence accorded to accused persons and also invade[d] the truth-finding task assigned solely to juries in criminal cases.' " (*Id.* at p. 599.)

The jury in the instant case was similarly instructed, resulting in the same error which was prejudicial in *Vanegas*.  The question for us is whether the error was prejudicial in our case.

"An instructional error which creates an improper mandatory presumption falls within the category of error subject to *Chapman* review.[5]  Under this standard of review, to find the error harmless we must be able to say beyond a reasonable doubt '[the] unconstitutional presumption did not contribute to the verdict.' [(*Yates v. Evatt* (1991) 500 U.S. 391, 404.)]" (*Vanegas, supra,* 115 Cal.App.4th at p. 602.)

---

[5] *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Flood* (1998) 18 Cal.4th 470, 502-503; footnote original, numbering changed.

Unlike the court in *Vanegas*, we are able to say "we are convinced beyond a reasonable doubt the erroneous instruction did not contribute to the verdict because . . . the presumption 'was unimportant in relation to everything else the jury considered' on the issue of dangerousness to human life." (*Vanegas, supra*, 115 Cal.App.4th at p. 602.)

The facts in *Vanegas* were quite different from the facts here. Vanegas drove a pickup truck into an alleyway at the rear of a Los Angeles apartment building where several men were drinking near a utility pole. The decedent, Sifredo Murillo, who appeared to be drunk, was leaning against the pole. Vanegas accelerated as he drove up an incline in the middle of the alley, and one witness moved out of the truck's way. She saw the pickup veer left toward the utility pole and hit Murillo, "pressing" him against the pole. Vanegas reversed the truck, then accelerated again, continuing to press Murillo against the pole. When Vanegas drove out of the alley, he almost struck a police car. Officer Moreno, who was driving the police car, stopped Vanegas for a traffic violation. When Vanegas got out of the truck, Moreno observed signs of intoxication and arrested him.

Meanwhile, Jose Blanco, who had been in the alley with Murillo, ran to the police car and told Moreno about the accident. When Moreno reached the scene, he saw Murillo on his back, not breathing. While Moreno and his partner waited for backup, Vanegas told Moreno he had just "got jumped" by some gang members about half an hour earlier and, indicating Murillo, said " 'that person over there . . . was the one that sent them.' " Moreno said nothing and Vanegas added, " 'I saw him in the alley when I was driving in alley [*sic*]. So I said, "Oh, I'll take care of this right now." ' " Murillo suffered multiple injuries to his pelvis, internal organs, and multiple blood vessels in the pelvic area. He died as a result of blood loss from these injuries. (*Vanegas, supra*, 115 Cal.App.4th at p. 596.)

A breath test administered to Vanegas three hours after the incident showed a blood alcohol level between 0.17 and 0.18 percent. A criminalist estimated that someone

with that blood alcohol level at 12:10 p.m. would have had a blood alcohol level of between 0.21 and 0.26 percent at 9:30 a.m. assuming no further consumption of alcohol. An accident reconstruction expert testified that he believed Vanegas was traveling 15 to 16 miles per hour when he struck Murillo. The prima facie speed limit in the alley was 15 miles per hour. The jury found defendant guilty of the charges as stated above, but did not return a verdict on a manslaughter charge and the count was dismissed. (*Vanegas, supra,* 115 Cal.App.4th at pp. 595-596.)

In considering the evidence the jury accepted in reaching its verdict (*Vanegas, supra,* 115 Cal.App.4th at p. 602), the reviewing court concluded that "the jury most likely focused solely on the fact Vanegas violated the basic speed law." (*Id.* at p. 603.) After analyzing other evidence which the court concluded that the jury had rejected in arriving at its verdicts, the court then concluded that it did not view the evidence of Vanegas' conduct "as so convincing on the issue of dangerousness the unlawful presumption could have had only 'minimal' effect on the jury's verdict." (*Ibid.*) Comparing the relatively innocuous facts in *Vanegas* with the stronger facts in *Watson, supra,* 30 Cal.3d 290, showing a pattern of dangerous and erratic driving, the court concluded that, as summarized by the prosecutor who was seeking a first degree murder conviction, Vanegas " 'was driving northbound up the alley, without hitting any of the telephone poles, without hitting the fence, without hitting any people.' After striking Murillo, 'he straightens out his vehicle to go north and exit the alley. He doesn't hit anyone or anything else, not the truck that's parked right behind the telephone pole, not the people standing near the Jack-in-the-Box area, and not the cars . . . . He makes a decision to not go left because he sees the cars coming. He's not so drunk that he does not know what's going on.' " (*Vanegas, supra,* 115 Cal.App.4th at p. 604.)

The court concluded, "If the much stronger facts in *Watson* were not necessarily sufficient to establish implied malice neither are the facts in the case before us." (*Vanegas, supra,* 115 Cal.App.4th at p. 605.)

24

In our case, defendant's behavior, briefly, driving while under the influence and speeding in a residential area through a number of stop signs with a driving history that had to have alerted him to the danger of what he was doing, was so egregious that the presumption could only have had a minimal effect on the jury's verdict. The evidence of defendant's culpability is overwhelming, and any error is harmless.

DISPOSITION

The People having conceded, the conviction for driving under the influence causing injury (Veh. Code, § 23153, subd. (a), count 8) is stricken. In all other respects, the judgment is affirmed.

_____<br>Premo, Acting P.J.

WE CONCUR:

_____
Elia, J.

_____
Bamattre-Manoukian, J.

25

## ADDENDUM

The following are excerpts from the cross-examination of defendant which he considers improper since the "reason for introducing this evidence was to show defendant had a propensity for drinking and driving."

"[Q.] Mr. Mason, you've left vehicular fatality accidents before and gone home and drank alcohol, haven't you?

"[A.] Yes, I have.

"[Q.] Yes, you have."

"[Q.] And you had been with your friend, Abad Hughes, during the better course or better part of the morning and evening preceding 3:20 in the morning, right?

"[A.] Yes. The morning and the afternoon, actually. . . .

"[Q.] And in the evening hours, you had come over to Salinas, right?

"[A.] Yes.

"[Q.] With your friend, Abad Hughes?

"[A.] No, I didn't come over to Salinas with him.

"[Q.] Came alone?

"[A.] Yes.

"[Q.] Met up with Mr. Hughes, right?

"[A.] Yes. I came over to another friend's of our's [sic] house.

"[Q.] While you were at the other friend's house, were you consuming alcohol?

"[A.] No.

"[Q.] No. How about Mr. Hughes, was he consuming alcohol?

"[A.] No.

"[Q.] No alcohol at all?

"[A.] No.

26

"[Q.] And then you're over at your friend's house.  His name was Jimmy, wasn't it?

"[A.] Yes. . . .

"[Q.] You went to another place in the City of Salinas after Jimmy Thornton's residence on March 18th. . . .

"[A.] Yes, yes. . . .

"[Q.] . . . And where was that?

"[A.] TGI Fridays.

"[Q.] TGIF?

"[A.] Uh-huh.

"[Q.] Local pub and bar here in Salinas?

"[A.] Yes. . . .

"[Q.] When you went back there in 2003, that particular establishment, it served hard liquor, didn't it?

"[A.] Yes, it did.

"[Q.] Served alcoholic beverages?

"[A.] Yes, it did.

"[Q.] And you consumed alcoholic beverages, did you not?

"[A.] No, we didn't.

"[Q.] How long were you there?

"[A.] Probably only a couple hours because I played, like, two games of pool and ordered something to eat.

"[Q.] And during that time did you see Mr. Hughes consume any alcohol?

"[A.] No, I didn't.  He was talking to Jimmy.

"[Q.] Then where did you go from there?

"[A.] We went back to Jimmy's house. . . .

"[Q.] Okay. And when you went back to Jimmy's house, and now we're into March 18th, 2001, early morning hours, right?

"[A.] I think we got back to his house, . . . say, 11:30, 1:00, something like that because we stayed there and we watched some videos, Dragon Balls. . . .

"[Q.] You left there about what time?

"[A.] Probably a little before 3:00.

"[Q.] . . . And while you were at Jimmy's house and before you left a little before 3:00, you had consumed alcoholic beverages there, hadn't you?

"[A.] Had not.

"[Q.] How about Mr. Hughes?

"[A.] No, I didn't see him consume any either.

"[Q.] You didn't see him consume anything?

"[A.] No.

"[Q.] How about Jimmy?

"[A.] Jimmy always drinks.

"[Q.] He was drinking alone that night?

"[A.] He drinks by himself."

After establishing the collision of the blue Jeep with Hughes's vehicle, the prosecutor focused on defendant's failure to render assistance.

"[Q.] You get out of your car. What kind of car?

"[A.] Dodge. Dodge Stratus.

"[Q.] Is it hard to get out of the car.

"[A.] Yes, it was.

"[Q.] How long did it take you to get out of the car, Mr. Mason?

"[A.] Probably about three minutes or so.

"[Q.] Thirty minutes to get out of the car?

"[A.] No, I said, 'three minutes.'

"[Q.] Three minutes, I'm sorry.

"[A.] Yes.

"[Q.] Three minutes. So you get out of the car. What do you do?

"[A.] Well, I climbed out of the ditch and went to the top of the road and I looked around and that's when I noticed that Abad's car was in the ditch some car lengths behind me and the other car was on the other side of the road. . . .

"[Q.] You go back to Abad's car, don't you?

"[A.] Yes.

"[Q.] What do you see when you get back there?

"[A.] He was hanging out of the window.

"[Q.] Was he dead or alive?

"[A.] He looked like he was deceased.

"[Q.] Okay. Did you try to help in any way as far as Mr. Hughes?

"[A.] There was nothing I could do. It was a scene that basically I couldn't do anything. As far as I knew, I couldn't do anything.

"[Q.] You couldn't do anything?

"[A.] Yeah.

"[Q.] So you didn't even approach him, right?

"[A.] I was just standing there on the road.

"[Q.] You didn't even approach him, right?

"[A.] No.

"[Q.] You didn't touch him, right?

"[A.] No.

"[Q.] So you're standing up there on the road for about how long?

"[A.] Probably about twenty minutes.

"[Q.] Twenty minutes?

"[A.] Something like that.

29

"[Q.] Twenty minutes. You stand up and you haven't even gone down to look at Mr. Hughes, right?

"[A.] No.

"[Q.] All right. So you're up there for twenty minutes. What happens next?

"[A.] Some lights came and they stopped and it was a guy there that I actually knew from a friend. I had met him over at his house, and he actually took me to call the police.

"[Q.] His name was Joshua Miller?

"[A.] I didn't know his last name, but I knew his name was Joshua, yes.

"[Q.] You're up there on the side of the road there about twenty minutes and Mr. Miller comes driving by. Is that what you're telling us?

"[A.] Yes.

"[Q.] During this time had you even gone to see what became of the driver of the blue Jeep?

"[A.] It was the same thing. I just looked. I thought he was probably not conscious or something. He was still intact in the Jeep.

"[Q.] I'm sorry, you thought he was unconscious?

"[A.] I thought he might be unconscious, but I really was just kind of in a state of, I don't know, blank. My mind was, like, blank. It was an accident.

"[Q.] Did you ever go over to the blue Jeep to look to see what had become of that particular occupant?

"[A.] I walked toward it, but I was just stuck. I was stunned.

"[Q.] Okay. And at what point during this twenty-minute period would you say you walked over to the blue Jeep?

"[A.] I didn't walk all the way over to it. I just walked to about where I was because the Jeep wasn't far from his car, and I just looked, turned around and looked.

"[Q.] Sir, are you telling us you walked maybe only halfway between Mr. Hughes in the car and the blue Jeep? You walked halfway as far as that distance?

"[A.] I think so.

"[Q.] Could you see any occupants in the blue Jeep from a point halfway between the two vehicles?

"[A.] Not really, because the road was dark.

"[Q.] So you really didn't know what type of injuries or whether or not the driver of the blue Jeep was hurt at all, correct?

"[A.] No, I didn't.

"[Q.] So you're up there about twenty minutes. Do you see any other people stop and try to help the driver of the blue Jeep?

"[A.] No, I didn't see anybody else.

"[Q.] Nobody else was there that stopped and was helping the driver of the blue Jeep?

"[A.] Not that I recall.

"[Q.] When you were standing right there in--you're near Mr. Hughes, right?

"[A.] Yes.

"[Q.] Could you see the blue Jeep from where you were standing by Mr. Hughes' vehicle?

"[A.] Yes. You could see the silhouette.

"[Q.] There is a silhouette?

"[A.] Yes. It was like over to the right-hand side.

"[Q.] While you were standing there, did you see any other cars stop near the Jeep?

"[A.] The only car I ever saw stopping was Joshua's car.

"[Q.] That's it? Okay. So, you saw no other vehicles and Joshua's car. When he stopped, what did you ask of him?

"[A.] Asked him--told him, do you have a cell phone and he told me no. I said, 'I need to call the police. We need to get out of here out [*sic*]. Take me so I can call the police.'

"[Q.] Okay. What did you want to call the police for, to get someone on the phone?

"[A.] Yes, to get them some help.

"[Q.] Why? To get who some help?

"[A.] Everybody involved.

"[Q.] You didn't know the driver of the blue Jeep was injured.

"[A.] Yes, but there was an accident that occurred. I wanted to get the police out there.

"[Q.] Mr. Mason, isn't it true that, while you're there on the scene and before you get into the vehicle of Mr. Miller, you have seen some motorists stop--

"[A.] No.

"[Q.]--with cell phones and call 911 emergency for help? You knew that at that time, didn't you?

"[A.] No, I did not.

"[Q.] You saw no other motorist stop?

"[A.] No, Ma'am.

"[Q.] You're out there for twenty minutes, don't see anybody and you ask Mr. Miller to take you to a phone; is that right?

"[A.] Yes.

"[Q.] Does he do that?

"[A.] Yes, he took me to my house. I gave him directions to my house.

"[Q.] Where was that?

"[A.] Schoonover Park at the time . . . Right off of Reservation. When you come up Blanco Road, you make the left right on Fort Ord and then left at the light, and that's Schoonover.

"[Q.] You had to go to the City of Marina in order to get to your home, right?

"[A.] Yes.

"[Q.] To use a telephone?

"[A.] Yes.

"[Q.] Now, did it cross your mind to go back to the City of Salinas to try to find a telephone since it was closer?

"[A.] The place where we came from, they didn't have a telephone, and I didn't know anyone else in Salinas.

"[Q.] Okay. You knew where the Salinas Police Department was, didn't you?

"[A.] At the time I think, but it was, like, the Salinas Police Department is just like the same length of distance almost.

"[Q.] Is like the what?

"[A.] The length of distance to Jimmy's house because their house is right around the corner across the street from Jimmy's house.

"[Q.] That was what your estimate was, as far as 9/10s of a mile beyond--

"[A.] Actually, probably the police station would be farther than Jimmy's house.

"[Q.] How about South Main Street and any businesses, any twenty-four hour business that might have been open there?

"[A.] As far as twenty-four hour businesses, I don't think I recall any at that time being open.

"[Q.] And as far as Reservation Road, weren't there any twenty-four hour businesses open there that you could have stopped at and used the telephone?

"[A.] Yes, but they were farther than my house."

33

After questioning defendant briefly about going home, calling 911, drinking a "couple sips" of banana rum, and going back to the scene at the dispatcher's request, the prosecutor asked,

"[Q.] Would it be the female officer or Officer Aston that was one of those officers that asked you about the odor of alcohol on your breath at the scene, . . .?

"[A.] That was the female officer. . . .

"[Q.] And she asked you whether you had been drinking, right?

"[A.] Yes.

"[Q.] And what was your response to them [*sic*]?

"[A.] I told her, yes, I drunk some alcohol at my house.

"[Q.] At your house?

"[A.] Yes.

"[Q.] After this terrible, terrible accident?

"[A.] Yes.

"[Q.] And that was just a couple of sips at that time?

"[A.] Yes. Probably, just, it was a fifth bottle, so I'm just saying a couple sips. I don't recall exactly how much I drunk out of it.

"[Q.] Back there on the road, Blanco Road, Mr. Mason, you told Joshua Miller to get you out of there because you had been drinking and driving; isn't that right?

"[A.] No, I did not tell him that.

"[Q.] You wanted to get out of there because you had been drinking and driving; isn't that right?

"[A.] No, that is not correct.

"[Q.] You wanted to get out of there to get help, is that what you're telling us, because there had been no other motorists there that had stopped, but Mr. Miller; is that right?

"[A.] That's the only motorist I remember seeing stop."

34

